[Civ. No. 18577. Third Dist. May 8, 1980.]

WESTERN OIL AND GAS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
STATE LANDS COMMISSION, Defendant and Respondent.

COUNSEL

Ingoglia, Marskey & Kearney, McCutcheon, Black, Verleger & Shea, Philip K. Verleger, Betty-Jane Kirwan and Lisa C. Woods for Plaintiffs and Appellants.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Dennis M. Eagan, Deputy Attorney General, for Defendant and Respondent.

OPINION

PARAS, J.—Plaintiff oil companies[1] and Western Oil and Gas Association (an association of oil companies) appeal from a judgment entered after the trial court ruled against them on cross-motions for summary judgment. The suit challenges administrative regulations adopted by defendant California State Lands Commission (Commission) in April 1976. (See Gov. Code, § 11440.) We affirm.

I

The Commission is composed of the Lieutenant Governor, the State Controller, and the Director of Finance. (Pub. Resources Code, § 6101.) It has exclusive jurisdiction over all tidelands and submerged lands owned by the state (and not previously granted by it to counties, cities, and others), including beds of navigable rivers, streams, lakes, bays, estuaries, inlets and straits. (*Id.*, § 6301.)

The Commission has the power to lease such lands (*ibid.*), after appraisal (*id.*, § 6503), upon terms and conditions it deems in the best interests of the state (*id.*, § 6501.2). It is also empowered to make and enforce all reasonable and proper rules and regulations to carry out its responsibilities. (*Id.*, § 6108.) Its procedures for enacting, repealing, and amending regulations are prescribed by the Government Code. (Gov. Code, § 11371 et seq.) Regulations must of course be consistent with the applicable statutes (*id.*, § 11374); notice of proposed changes

---

[1]Pacific Refining Company, Edgington Oil Company, Atlantic Richfield Company, Exxon Corporation, Getty Oil Company, Lion Company, Shell Oil Company, Chevron U.S.A., Inc. and Union Oil Company of California.

must be given (*id.*, § 11423), interested persons must be allowed to comment (*id.*, § 11425), and relevant comments must be given consideration. (*Ibid.*; Pub. Resources Code, § 6110.)

In March 1975, the Commission's leasing regulations (Cal. Admin. Code, tit. 2, div. 3), provided for commercial and industrial lease rates determined by a percentage of annual gross income or 6 percent per annum of the appraised value of the leased land. (Former Cal. Admin. Code, tit. 2, § 2005, subd. (b)(1).) Conduits and pipelines were assessed a rental charge of 1 cent per diameter inch per lineal foot. (Former Cal. Admin. Code, tit. 2, § 2005, subd. (b)(6).) For industrial leases involving crude oil, natural gas, or liquified natural gas pipelines, the Commission proposed to amend these regulations by (1) increasing the appraised value rate to 8 percent, and (2) adding "throughput" rental rates as an alternative to percentage of appraised value or size of pipeline rates. More specifically, the proposed revisions would have allowed the Commission to charge specified rates according to the annual volume of oil or gas passing through a pipeline or 8 percent per annum of the appraised value of the leased property plus 1 1/2 cents per diameter inch per lineal foot of pipeline, whichever resulted in the greater annual rent. The changes were designed, according to the Commission's staff, to bring leasing policies into line with practices commonly used by ports in the state.

Reaction from oil and utility companies was unfavorable. At public hearings held April 29 and May 2, 1975, industry representatives challenged the analogy to rates charged by ports, pointing out that such marine terminal facilities used throughput rates to recover their expenses for engineering, construction, and maintenance while the Commission leased only unimproved sites on which the lessees constructed and maintained the necessary facilities. Objections to the increased cost of state leases were voiced and predictions were submitted as to the effect of the proposed throughput rates on consumer prices and their precedential impact on other lessors of pipeline lands.

The Commission deferred action on the proposed throughput regulations pending further staff study and public hearings, and at its regular May 1975 meeting adopted amended leasing regulations without reference to throughput rates. Additional written comments however were solicited from industry; and the Commission staff met with representatives of public utilities, pipeline common carriers, and the oil industry in July 1975.

At its regular meeting on April 28, 1976, the Commission received new throughput regulation proposals from its staff and authorized public hearings on them. The new proposed amendments, as ultimately adopted, authorize throughput rates as alternative rent in industrial and right-of-way leases. No specific rates are set forth, and the requirement of adoption of the method yielding the highest rent is replaced by a direction to the Commission to consider the amount of revenue accruing to the state under each alternative and select that which is in the state's best interests. Other considerations affecting the decision are whether the land to be leased is environmentally significant, the extent of potential damage to it, whether the rental rate will result in the use of substitute facilities by a prospective lessee, and the availability, reliability, and applicability of comparable or related data concerning the land's value. Provisions are also included limiting throughput charges on commodities passing over the same state land more than once and apportioning rates according to the relationship between state land passage and total in-state pipeline length.[2]

At a public hearing on the proposed new throughput regulations, the Commission's executive officer stated that additional staff studies and research since the previous hearings showed that throughput charges imposed by ports often reflected a return based upon the use of unimproved land. Oil and utility companies again opposed the changes, adding as a reason that they are vague and make it difficult to estimate lease costs.

The Commission adopted the revised regulations on April 28, 1976, and thereafter denied plaintiff Western Oil and Gas Association's petition for their repeal.

## II

Plaintiffs' initial complaint for injunctive and declaratory relief alleged the Commission exceeded its statutory authority in adopting the throughput regulations, since they are not based on the appraised value of the land; also that the regulations are unreasonable, arbitrary, and capricious as an attempt to extract exorbitantly high charges for the use of state land and as causing discriminatory treatment of lessees using the same amount of state land for different volumes of commodities

---

[2]In their final form these regulations appear in the California Administrative Code, title 2, sections 2005 and 2006.

passing through pipelines. Several specific leases containing throughput provisions currently in the process of negotiation or previously entered into under protest were described in the complaint, and it was alleged that the Commission intended to impose throughput provisions in future lease renewals. Violations of federal constitutional provisions were also claimed, but the superior court was not asked to rule on such contentions as they were being independently asserted in a pending federal district court action.

The Commission's answer denied implications of monopoly control of tide and submerged lands and informed the court that the Commission had deposited rental revenues received by virtue of throughput lease provisions into a special account pending resolution of the suit and was willing to do the same with similar future revenues.

On November 15, 1978, after resolution of various discovery matters involving protective orders, the Commission noticed a motion for summary judgment, alleging that the only evidence properly before the court was the seven-volume administrative record of materials and testimony considered by the Commission in the adoption and denial of repeal of the disputed regulations, hence there was no triable issue of fact. On December 13, 1978, plaintiffs noticed their own motion for summary judgment. They appended declarations which they claimed showed negotiated throughput lease provisions resulting in revenues ranging from 18 to 28 percent of appraised value per annum, which were a deviation from the Commission's previous practice and exceeded a reasonable annual return of 10 percent on the land. They asked the court to take judicial notice of the facts therein alleged or to receive the declarations into evidence for the purposes of their summary judgment motion, contending that the operative effect of the regulations was material to their validity.

The Commission objected to the filing of the declarations, contending again that the only proper evidence in the case was the record upon which the Commission acted.

A hearing on the motions was held on January 16, 1979. The court and counsel discussed at length the question of whether plaintiffs' complaint attacked the regulations only on their face or whether the attack included an "as applied" contention, which would permit consideration of the declarations. Counsel for plaintiffs requested leave to file an

amended complaint and the court granted it "upon the stipulation of the parties that in the event there is a...significant substantive change in the complaint that the cross motions may be treated as motions for partial summary judgment on the issue of facial constitutionality."

Plaintiffs' "Amended and Supplemental Complaint," filed on January 26, 1979, includes a prayer for a declaration that throughput regulations are unlawful and invalid *as applied* to specific leases. Five renewal leases are described therein and as to four of them figures showing the annual rate of return on the appraised value of the respective properties are enumerated. The rate ranges from 12.5 percent to 29 percent. In a supplemental memorandum filed before the second hearing of February 16, 1979, plaintiffs urged the court to grant their motion for summary judgment on all the issues, including the issue of "as applied" validity. No answer to the amended complaint was filed and no motion for summary judgment thereon was made by the Commission.

At the beginning of the second hearing, counsel for the Commission argued that the only issue before the court was the facial validity of the throughput regulations; counsel for plaintiffs argued that the issues of facial and as applied validity are inextricably intertwined and should be considered at the same time, and both were ripe for decision. The court announced that it would treat the matter as partial summary judgment regarding facial constitutionality only. The hearing continued on that basis.

On March 9, 1979, the court filed an opinion and order in which it rejected plaintiffs' contentions of facial invalidity of the regulations and granted the Commission's motion for summary judgment. The court also concluded that plaintiffs' "as applied" contentions were but another way of arguing that Commission leases must be based upon appraised value of the land, and summary judgment should also be for the Commission thereon. A formal order of March 15, 1979, granted the Commission's motion, denied the plaintiffs' motion, declared the disputed regulations lawful and valid, and declared the leases lawful and valid with reference to their provisions for rentals based on throughput charges. Judgment was entered accordingly and this appeal followed.

### III

In a recent decision, our Supreme Court provided the following summary of judicial review of rule making by administrative agencies:

"Although administrative actions enjoy a presumption of regularity, this presumption does not immunize agency action from effective judicial review. A reviewing court will ask three questions: first, did the agency act within the scope of its delegated authority; second, did the agency employ fair procedures; and third, was the agency action reasonable. Under the third inquiry, a reviewing court will not substitute its independent policy judgment for that of the agency on the basis of an independent trial de novo. A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31] (fns. omitted).)

No issue of procedural irregularity is raised here. We therefore consider the two remaining questions; first, the scope of the Commission's authority to amend its rental regulations by adding a throughput rental scheme, and second, the alleged arbitrariness of that scheme. We do so first on the issue of facial invalidity.

■ Plaintiffs' primary argument is that the "tidelands trust" requires the Commission to promote commerce, fisheries and navigation, and the burden on commerce imposed by throughput regulations contravenes that trust. Disagreeing with plaintiffs as to the nature of the tidelands trust, we reject the contention.

When California became a state in 1850 it succeeded to sovereign ownership of various tidelands and submerged lands under the terms of common law trust doctrine evolved from Roman and English law. (*Shively* v. *Bowlby* (1894) 152 U.S. 1, 48-49 [38 L.Ed. 331, 349, 14 S.Ct. 548]; see Comment, *California's Tidelands Trust for Modifiable Public Purposes* (1973) 6 Loyola L.A. L.Rev. 485.) Such lands are held in trust for public purposes, traditionally defined as navigation, fishery, and commerce. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 482 [91 Cal.Rptr. 23, 476 P.2d 423]; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 584 [138 P. 79]; *Boone* v. *Kingsbury* (1928) 206 Cal. 148, 184 [273 P. 797].) Notwithstanding early abuses (see Comment, *supra*, 6 Loyola L.A. L.Rev. at pp. 504-505), limitations upon the sale of tidelands are now firmly established by state constitutional (art. X, § 3), and statutory (Pub. Resources Code,

§ 7991), provisions. Even where sales antedated these limitations, absolute ownership did not pass; the land remained subject to a public easement for purposes encompassed by the trust. (*People* v. *California Fish Co., supra,* 166 Cal. at p. 596.)

There is of course no trust prohibition on leasing. As noted, the state, acting through the Commission, may lease tidelands under terms and conditions it determines to be in the best interests of the state. (Pub. Resources Code, §§ 6301, 6501.1.) The state may also grant tidelands to local governments, subject to the trust. (*Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24 [41 Cal.Rptr. 9, 396 P.2d 41].) Either governmental entity may allow or disallow commercial or industrial development of tidelands; the decision is discretionary and dependent upon an assessment of the public interest. (*Higgins* v. *City of Santa Monica, supra,* at p. 29; *San Pedro etc. R. R. Co.* v. *Hamilton* (1911) 161 Cal. 610 [119 P. 1073].) Whether or not a public entity's action tends to "foster commerce," and on what terms, are thus issues concerning the public welfare. Commerce is not to be fostered for its own sake, but for the sake of the people of the State of California. (See *Boone* v. *Kingsbury, supra,* 206 Cal. at pp. 181-182.) This is where plaintiffs' argument fails. The disputed regulatory scheme does not on its face prohibit or even impede commerce. Since the requirement of obtaining the highest possible return on every lease has been eliminated, it is even possible for throughput charges to result in lesser total rent than other schemes. In any event, since the Commission is not compelled under the tidelands trust to lease at all, it is not precluded from devising alternative means of determining rental rates in the public interest.

■ Plaintiffs also contend the Commission exceeded its statutory authority in enacting throughput rental regulations because section 6503 requires an appraisal of the land before the rental "or other consideration" is fixed.[3] They argue that if the Legislature had intended to give the Commission unlimited authority to determine the basis or amount of rentals, it would not have required the Commission to obtain an appraisal, and any such unlimited authority would be an unlawful

---

[3]When the regulations were adopted, section 6503 stated: "Upon receipt of an application to lease lands under this chapter, the commission shall appraise the lands and fix the annual rental or other consideration therefor...."

The 1977 and 1978 amendments did not affect the quoted portion except to change "rental" to "rent."

delegation. There is no merit in the latter argument (see 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 91, p. 3326); and we disagree with the former, at least as to the rental scheme here involved.

As plaintiffs point out, the words of a statute must be given their usual, ordinary import. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33].) The statute simply requires the Commission to ascertain the value of the land before the rent is fixed. It does no more than ensure that the Commission will have an informational base before proceeding, a common sense requirement for any landlord. Other Public Resources Code sections vest "full authority" to lease state lands in the Commission (§ 6216), "upon such terms and for such consideration, if any, as are determined by it" (§ 6301). Construing section 6503 with reference to the entire statutory system defining the Commission's powers and responsibilities (*Merrill* v. *Department of Motor Vehicles, supra*, 71 Cal.2d at p. 918), we find no merit in plaintiffs' contention regarding section 6503.

## IV

■ Plaintiffs next contend reversal is required because the record of hearings conducted by the Commission and its representatives shows that all who testified were opposed to the throughput rental concept. They also claim the staff reports do not support throughput rates. Thus, they assert, the record is lacking in evidentiary support for the regulations, making them unreasonable, arbitrary, and capricious.

The "evidence" necessary to support these regulations is, of course, more judgmental than factual. "Transported into the legislative process, this nomenclature tends to evoke spurious responses. Thus *witnesses* appear to *testify* or give *evidence* before legislative investigating committees. Actually, most such witnesses utter opinion and argument rather than recollection or narration, seeking to produce belief in ideas rather than proof of facts. Stripped of verbal garments borrowed from the judicial process, such utterances may be viewed in their true character and met on their own terms, vulnerable to rebuttal by counterargument and countervailing opinion without cross-examination as the attritional prelude." (*Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 590 [71 Cal.Rptr. 739]; italics in original.) The distinction is between adjudicative and legislative facts. "Adjudicative facts are the facts about the parties and their activities, businesses,

and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." (1 Davis, Administrative Law Treatise (1958) § 7.02, p. 413.)

There being, as we have determined, no legal impediment to the adoption of a throughput rental rate scheme either in the statute or in the tidelands trust, the question before the Commission was simply whether such a scheme was appropriate. Staff information indicated throughput rates were used by various other private and public land-owners for unimproved properties, so in this sense there was evidentiary support for the Commission's decision. The extensive record of proceedings before the Commission shows that it followed the statutory mandate to receive comments, and the revisions in the proposed regulations show that the comments were considered and did have an effect on the final decision. It is not surprising that lessees faced with a scheme which could result in higher rentals than they would otherwise pay would unanimously oppose such rates, but the Commission must act in the public interest and could reasonably conclude that throughput rentals are appropriate for that purpose.

We hold that the Commission did not act arbitrarily in adopting throughput regulations. "An action is arbitrary when it is based on no more than the will or desire of the decision-maker and not supported by a fair or substantial reason." (*California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 810, fn. 10 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735], quoting *Bedford Inv. Co.* v. *Folb* (1947) 79 Cal.App.2d 363, 366 [180 P.2d 361].) An alternative method of computing state lands rent which is used by other landowners in the public and private sector and does not necessarily result in exorbitant rents is simply not arbitrary, capricious, or unreasonable on its face. We neither applaud or denounce the Commission's judgment; we simply find no legal cause to interfere with it.

V

Plaintiffs' final contention is that the court erred in granting summary judgment for the Commission on the issue of whether the spe-

cific throughput rates contained in various existing leases were unreasonable, the "as applied" cause of action in the amended complaint. As we have noted, the court first announced it would treat the cross-motions as partial summary judgment motions, then concluded the "as applied" contentions were merely a rephrasing of plaintiffs' legal argument that rental rates must be based on a percentage of appraised value, and granted full summary judgment. Plaintiffs urge error in that the court granted a motion which had never formally been made. (*Dvorin* v. *Appellate Dept.* (1975) 15 Cal.3d 648 [125 Cal.Rptr. 771, 542 P.2d 1363].) The Commission's response is that the court could properly have ruled (and did in effect rule) that plaintiffs' amended complaint fails to state a cause of action. This contention of course can be raised at any stage in the proceedings. (Code Civ. Proc., § 430.80; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 808, pp. 2418-2419.) If it is well taken, the error is not prejudicial.

This issue, as with the facial invalidity question, is whether the tidelands trust concept or any other tenet of law restricts the state to a "reasonable" rental; and if so, is a rental which yields annually as much as 30 percent of appraised value unreasonable?

As argued in the Commission's brief, "...the State's ownership in trust lands has a dual nature: the governmental obligation to protect trust uses of such lands by the public (the '*jus publicum*'), and the proprietary right, as an incident of ownership, to obtain compensation for the sale or lease of such land to private parties (the '*jus privatum*'). *Oakland* v. *Oakland Water Front Co.* (1897) 118 Cal. 160, 183; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 593-594, 596, 599; *Marks* v. *Whitney* (1971) 6 Cal.3d 251, 260; *Boston Waterfront Dev. Corp.* v. *Comm.* (Mass. 1979) 393 N.E.2d 356, 359; *Brusco Towboat Co.* v. *State* (Ore.App. 1977) 567 P.2d 1037, 1044-1045, affd. in part (Ore. 1978) 589 P.2d 712, 718.) The *jus privatum* is the normal right to sell or lease something which is owned; the *jus publicum*, however, which cannot be sold or leased, restricts that normally broad right. When the State leases trust lands, it is exercising a proprietary function, with the caveat that it cannot unreasonably impair the public's trust rights (the *jus publicum*). (See *ibid.*; *Athletic Club* v. *Board of Harbor Commrs.* (1933) 130 Cal.App. 376, 386-387; *Spalding* v. *United States* (S.D. Cal. 1937) 17 F.Supp. 957, 962, affd. (9th Cir. 1938) 97 F.2d 697.)"

To the extent that the state exercises its *jus privatum*, as it does here, its limitations are only those imposed by the state and federal Constitu-

tions, of which due process is the most obvious. Independently of constitutional considerations, the state may negotiate and contract as does any other person. Applying this principle to the rental provisions of the leases described in the amended complaint, we agree with the trial court; there is no "as applied" invalidity.[4]

The judgment is affirmed.

Puglia, P. J., and Blease, J., concurred.

A petition for a rehearing was denied June 2, 1980, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 2, 1980.

---

[4]It is arguable that the amended complaint states a cause of action in contract, because certain leases antedating the new regulations contain options to renew at a "reasonable rental" and future renewal rentals up to and beyond 30 percent of appraised value annually are allegedly unreasonable. Our careful reading of the amended complaint leaves us with the conclusion that such allegations cannot fairly be read into it. Its purpose, as expressed therein and also in oral argument, is to attach the regulations and not to seek a contractual remedy. In any event, plaintiffs are not precluded from raising contractual claims as to future renewals.