**WESTERN OIL AND GAS ASSOCIA-
TION, et al., Plaintiffs-Appellees,**

v.

**Kenneth CORY, et al.,
Defendants-Appellants.**

No. 82–4261.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1983.

Decided Jan. 13, 1984.

As Amended Feb. 29, 1984.

Betty Jane Kirwan, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for plaintiffs-appellees.

Dennis M. Eagan, Deputy Atty. Gen., San Francisco, Cal., for defendants-appellants.

Before TANG and ALARCON, Circuit Judges, and TAYLOR,* District Judge.

TANG, Circuit Judge.

The California State Lands Commission ("Commission") and its members appeal from the district court's grant of summary judgment in favor of plaintiffs, eight oil companies and their trade association, the Western Oil and Gas Association. The court below overturned as unconstitutional the regulations promulgated by the Commission that compute "rent" for the leasing of state-owned tidelands and submerged lands based on the volume of oil in interstate and foreign commerce passing over the leased property. We agree that the regulations violate both the Commerce Clause and the Import-Export Clause of the United States Constitution and affirm.

## I. BACKGROUND

In 1953 Congress enacted the Submerged Lands Act, 43 U.S.C. §§ 1301–1315. The Act conveyed to the States title to the land underlying the nation's harbors and seas from the high tide mark to the three-mile limit. In California, the State Lands Commission administers the tidelands and submerged lands and is authorized to lease property upon terms it deems to be in the best interest of the State. Cal.Pub.Res. Code §§ 6216, 6301, 6501–6509.

Plaintiffs own and operate several refineries on the California coast adjacent to the State lands. It is uncontested that "[p]etro-leum substances must enter or depart from the facilities through a system of pipelines. Due to the physical and practical immobility of plaintiffs' processing plants, the pipelines must traverse tidal and submerged lands owned by the State." *Western Oil and Gas Ass'n v. Cory,* No. S–76–513, slip op. at 1 (E.D.Cal. Apr. 15, 1982).

Prior to April 28, 1976, the Commission leased these lands for a flat annual rate of six percent of the appraised value of the land. Thereafter, the Commission amended the regulations to allow for an alternative rental calculation based on the volume of commodities passing over the state-owned lands. The new volumetric rate, also known as a throughput charge, was codified in 2 Cal.Admin.Code § 2005 (current version at § 2003):

2005. Payment of Rentals.

(a) . . . .

(b) Rental Rate Schedule: The following rates shall apply to the classifications listed below:

.     .     .     .     .

(2) *Industrial Use:* The rental may be based on eight percent (8%) per annum of the appraised value of leased land together with 1½ cents per diameter inch per lineal foot for pipelines and conduits within the leased premises; and/or *an annual rental, with a specified minimum, based upon the volume of commodities passing over State land.* The minimum rental under either of these alternative rentals shall not be less than $550 per annum.

(3) *Right of Way Use:* Eight percent (8%) per annum of the appraised land value, together with damages, if any; and/or for pipelines and conduits, 1½ cents per diameter inch per lineal foot per annum, or, in lieu of either of the foregoing, *an annual rental, with a specified minimum based upon the volume of commodities passing over State land.* The minimum rental under any of the above alternatives shall not be

---

* Honorable Fred M. Taylor, District Judge for the District of Idaho, sitting by designation.

less than $100 per annum (emphasis added).

The regulations do not set specific volumetric rates, but leave these rates subject to negotiation upon renewal of individual leases. Since the regulations were adopted, the Commission has, with each lease renewal, appraised the land, set a minimum annual rent of eight percent of the appraised value, and added an additional charge based on the volume of commodities passing over the leased land.

In September 1976, plaintiffs commenced the present action challenging the validity of the volumetric charges under the Commerce Clause, the Import-Export Clause and the Duty of Tonnage Clause of the United States Constitution. Plaintiffs also contended that the charges violated a variety of state laws. The district court stayed the federal proceedings to allow for litigation of the state law issues in the California courts. The Sacramento County Superior Court subsequently upheld the volumetric rates and the decision was affirmed on appeal. *Western Oil and Gas Ass'n v. California State Lands Comm'n,* 105 Cal.App.3d 544, 164 Cal.Rptr. 468 (1980).

In 1981, the parties returned to federal district court seeking adjudication of the federal constitutional claims. The trial court held that the volumetric throughput charge placed a burden on interstate and foreign commerce and that the assessments violated the Commerce, the Import-Export and the Duty of Tonnage Clauses. The court therefore granted Western Oil's motion for summary judgment and enjoined the Commission from assessing and collecting rent based on the volume of commodities in interstate and foreign commerce passing over tide and submerged lands. The Commission appeals timely.[1]

## II. COMMERCE CLAUSE

■ The Commerce Clause provides that Congress has the power "To regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. It is a limitation upon the power of the States and reflects the Framers' concern that the tendencies of the States towards economic Balkanization had to be avoided. *Hughes v. Oklahoma,* 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1730–31, 60 L.Ed.2d 250 (1979); *Freeman v. Hewit,* 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946). Under the Clause, "[a] State is . . . precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States." *Id.*

### a. *Applicability of the Commerce Clause*

It is undisputed that up to 95% of the petroleum substances entering the oil companies' facilities are of foreign origin and that between 46–98% of the products leaving the refineries are channeled into interstate and foreign commerce. There is, therefore, no question that plaintiffs' activities are carried out in interstate commerce. *See, e.g., Maryland v. Louisiana,* 451 U.S. 725, 755–56, 101 S.Ct. 2114, 2133–34, 68 L.Ed.2d 576 (1981); *Michigan Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157, 169–70, 74 S.Ct. 396, 402–03, 98 L.Ed. 583 (1954).

The State contends, however, that its leasehold activities fall outside the reach of the Commerce Clause, because it carries on a proprietary function when it leases tide and submerged lands. Moreover, the State maintains that it is merely one of many participants in the market competing for leases.

■ When a state acts as a market participant, rather than a market regulator, it is said to act in a proprietary capacity and is not subject to the limitations of the Commerce Clause. *See White v. Massachusetts Council of Constr. Employers,* —— U.S. ——, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436, 439, 100 S.Ct. 2271, 2277, 2278, 65 L.Ed.2d 244 (1980). The United States Supreme Court has, therefore, on several occasions held a state's participation in the market place as a competitor to be shielded

---

1. The district court granted, for good cause, the Commission's "protective motion" for retroactive extension of time for filing a notice of appeal pursuant to Fed.R.App.P. 4(a)(5).

from the Commerce Clause. *See, e.g., White,* 103 S.Ct. at 1048 (contracting for construction of public projects); *Reeves,* 447 U.S. at 440, 100 S.Ct. at 2279 (selling of cement); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 809–810, 96 S.Ct. 2488, 2497–2498, 49 L.Ed.2d 220 (1976) (recycling of automobiles).

■ Yet in the case at bar, California's role cannot be said to be one of a market participant. The State owns and controls tidelands and submerged lands in its sovereign capacity. *See Shively v. Bowlby,* 152 U.S. 1, 58, 14 S.Ct. 548, 569, 38 L.Ed. 331 (1894); *California v. United States,* 512 F.Supp. 36, 40 (N.D.Cal.1981) (citing *Illinois Central R.R. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892)). Although some of the lands are in the possession of local State entities or private interests, this does not mean that California becomes one of many competitors. The permanency of plaintiffs' facilities does not permit them to "shop around". There is no other competitor to which they can go for the rental of the required strip of California coastline. The Commission has a complete monopoly over the sites used by the oil companies. The companies have no choice but to renew their leases despite the volumetric rate, as the oil, gas and petroleum-derived products cannot be transported to plaintiffs' facilities without traversing the state-owned lands. This control over the channels of interstate commerce permits the State to erect substantial impediments to the free flow of commerce. We therefore reject the State's contention that its leasing activities are not subject to Commerce Clause scrutiny.

### b. Volumetric Rate

Plaintiffs do not dispute the State's right to the reasonable rental value of its property. They contend, however, that the computation of rent based on the volume of commodities passing through its pipelines bears no relationship to any benefit conferred by the State and that such a charge is unconstitutional.

The State argues that there is nothing unreasonable about its volumetric leases; they are a common rental mode used by other lessors. Moreover, it contends that the reasonableness of the volumetric rates have been determined in the related state court litigation; therefore, the parties are precluded by the doctrine of collateral estoppel from relitigating that issue.

### A. Reasonableness of the Volumetric Rates

■ Our consideration of the reasonableness of the volumetric rates is not precluded by the state court litigation. The state proceedings addressed whether the throughput regulations were unreasonable, arbitrary and capricious "as an attempt to extract exorbitantly high charges for the use of state land . . . ." *Western Oil,* 105 Cal.App.3d at 560, 164 Cal.Rptr. at 471. This is a different inquiry from determining whether an assessment is reasonable for Commerce Clause purposes. The California court was not faced with the question whether the volumetric rates placed a burden on interstate commerce. Rather, they simply reviewed the Commission's promulgation to determine whether that agency was arbitrary, unreasonable, or capricious in adopting that rental mode. As the California Court of Appeals acknowledged, the State trial court was not requested to review the federal constitutional claims pending in federal court. *Id.* Moreover, under the abstention doctrine, a litigant should not be denied the right to have his claims fully litigated upon return to federal court. *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 421, 84 S.Ct. 461, 467, 11 L.Ed.2d 440 (1964).

### B. Relation Between State Benefits Conferred and Volumetric Rates

The district court below held that because the throughput charge is not regulatory in nature, its reasonableness is of no concern. The court then, however, went on to determine that there was no relation between the throughput charge and services and benefits provided by the State. This is the proper constitutional inquiry under the present facts, as our discussion will show.

Although the volumetric rates are designated as "rent" by the State, it is the practical effect of an exaction, not its label that is the focus of analysis under the Commerce Clause. *See, e.g., Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 615, 101 S.Ct. 2946, 2952, 69 L.Ed.2d 884 (1981); *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977); *Nippert v. Richmond,* 327 U.S. 416, 431, 66 S.Ct. 586, 593, 90 L.Ed. 760 (1946). The volumetric charges are exacted specifically in return for the use of the coastal property. The present case therefore falls within the bounds of the Supreme Court cases that have reviewed "challenges to 'user' fees or 'taxes' that were designed and defended as a specific charge imposed by the State for the use of state-owned . . . facilities and services." *Montana,* 453 U.S. at 621, 101 S.Ct. at 2955. *See also St. Louis v. Western Union Tel. Co.,* 148 U.S. 92, 97, 13 S.Ct. 485, 487, 37 L.Ed. 380 (1893) (rent "is not graduated by the amount of the business, nor . . . fixed for the privilege of doing business.").

California does have the right to exact compensation for conferring upon plaintiffs the right to use the real estate in question. *Id.* at 99, 13 S.Ct. at 488. Further, the charges need only be a fair, not an exact approximation of the use of the land. *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,* 405 U.S. 707, 716–17, 92 S.Ct. 1349, 1355, 31 L.Ed.2d 620 (1972). Yet these "user" charges cannot be disproportionate to the benefits conferred by the State. *Montana,* 453 U.S. at 622 n. 12, 101 S.Ct. at 2956 n. 12; *Vanderburgh,* 405 U.S. at 714, 92 S.Ct. at 1354.

■ In applying the above principles to the case at bar, we find that the throughput charge is not directed toward compensating the State for the use of the land and violates the Commerce Clause. It is undisputed that the lands leased to plaintiffs are unimproved and that no services or facilities are provided by the State in conjunction with the lease. Plaintiffs must perform all operations that are required to make use of the land, such as dredging operations and installation and maintenance of the pipeline system. While under the pre-1976 leasing system, there was a correlation between the annual rental and the land's appraised value, a similar correlation is lacking under the present mode. Payments to the State now vary depending on the volume of petroleum substances travelling in interstate commerce, not on the "wear and tear" from use of the land. The United States Supreme Court has held a similar "compensating" charge to be violative of the Commerce Clause, because it was proportioned solely to the earning capacity of a vehicle, not the wear and tear caused by the vehicle incident to use of the state highways. *Interstate Transit, Inc. v. Lindsey,* 283 U.S. 183, 190, 51 S.Ct. 380, 382, 75 L.Ed. 953 (1931). In that case, as in the case at bar, there was no sufficient relation between the measure employed and the extent of the use of the state property. *Id. See also Vanderburgh,* 405 U.S. at 714, 92 S.Ct. at 1354 (charge on state-provided facility must be designed to help defray its cost) (citing *Lindsey*); *McCarroll v. Dixie Greyhound Lines,* 309 U.S. 176, 180, 60 S.Ct. 504, 506, 84 L.Ed. 683 (1940) (toll on amount of gasoline over 20 gallons in carrier's tank in return for road use invalidated).

The volumetric rates are also not justifiable as a means of compensating the State for environmental damage caused by the flow of plaintiffs' petroleum substances over the tide and submerged lands. Under both their leases and various state statutes, plaintiffs are held accountable for environmental damage resulting from their operations. The leases provide for the posting of a surety bond, the acquisition of public liability insurance for property damage, and requires plaintiffs to have an oil spill contingency plan. State statutes, in turn, provide for oil spill contingency plans and civil liability for environmental damage. *See, e.g.,* Cal.Gov't Code § 8574; Cal.Harb. & Nav.Code § 151; Cal.Water Code § 13350. It is also noteworthy that the administrative provisions do not require throughput charges to be related to services or facilities provided. *See* Cal.Admin.Code § 2005.

We are of the opinion that the volumetric rates are a disguised revenue raising measure. The rates do not reflect the value to the State of its land, but the maximum amount of revenue California can extract from interstate commerce by utilizing its strategic geographic position. There is no correlation between benefits conferred by the State and the throughput charges. We therefore hold that the charges impose an undue burden on interstate commerce and are violative of the Commerce Clause.

## III. IMPORT–EXPORT CLAUSE

One of the major defects in the Articles of Confederation, and an impetus for the Constitutional Convention of 1787, was that the Articles allowed individual states to burden commerce among themselves and with foreign countries. *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 283, 96 S.Ct. 535, 539, 46 L.Ed.2d 495 (1976); *see also* 1 W. Crosskey, *Politics and the Constitution in the History of the United States,* 295–323 (1953). "Before 1787 it was commonplace for seaboard States with port facilities to derive revenue to defray the costs of state and local governments by imposing taxes on imported goods destined for customers in other States." *Michelin* at 283, 96 S.Ct. at 539. The founding fathers sought to limit state power to tax foreign commerce by the absolute proscription announced in Article I, § 10, cl. 2 of the Constitution: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws .…"

■ The term "impost or duty" is not self-defining, however, and not every state assessment that burdens foreign commerce is prohibited by the Clause. Although the constitution forbids the states from exploiting their position to the detriment of foreign commerce, they are entitled to compensation for services or property they provide. *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 286–94, 96 S.Ct. 535, 541–44, 46 L.Ed.2d 495 (1976); *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 315–20, 13 L.Ed. 996 (1851). In recent cases, the Supreme Court has focused the Import-Export analysis on whether a challenged exaction offends the policy considerations that underlie the Clause. *Department of Revenue v. Ass'n of Washington Stevedoring Cos.,* 435 U.S. 734, 752–53, 98 S.Ct. 1388, 1400–01, 55 L.Ed.2d 682 (1978); *Michelin,* 423 U.S. at 285–86, 96 S.Ct. at 540–41. These policies are:

[T]he Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

*Id.* (footnotes omitted).

■ We focus our analysis on the third Import-Export policy, namely whether the volumetric rates disturb the harmony among the States. The Supreme Court has held that such harmony is not disturbed if a coastal jurisdiction "receive[s] compensation only for services and protection extended to the imports." *Stevedoring,* 435 U.S. at 753, 98 S.Ct. at 1400. The High Court has, therefore, upheld a nondiscriminatory ad valorem property tax on imported tires stored in a Georgia warehouse, because the tax was the *quid pro quo* for benefits actually conferred by the state. *Michelin,* 423 U.S. at 288–90, 96 S.Ct. at 542–43.

As our analysis under the Commerce Clause has shown, there is no correlation between the volumetric rates and benefits conferred by the State as required by *Michelin.*[2] We therefore come to the inevi-

**2.** "[T]he desire [under the third Import-Export policy] to prevent interstate rivalry and friction

table conclusion that the volumetric rates are not exacted in return for the use of the tide and submerged lands, but as "a form of tribute . . . to the disadvantage of the other States." *Michelin* at 286, 96 S.Ct. at 541. California is exploiting its favorable geographic situation to exact a transit fee from the goods in question. It is "levying . . . on citizens of other States by taxing goods merely flowing through their ports to the other states not situated as favorably geographically." *Id.* 285–86, 96 S.Ct. at 540–41.

In calculating the value of the leaseholds, therefore, California cannot be permitted to rely on a rental formula that exploits its control over the crucial tidelands. "[A]s it cannot be done directly, it could hardly be a just and sound construction of the constitution which would enable a State to accomplish precisely the same thing under another name, and in a different form." *License Cases,* 46 U.S. (5 How.) 504, 576, 12 L.Ed. 256 (1847).

We also note that although the state regulations do not, by their terms, single out imported goods for assessment, this is the inevitable result. As previously stated, up to ninety-five per cent of the crude oil entering California was in foreign commerce, and the evidence suggests that this estimate could have been higher. A charge that is nondiscriminatory on its face may well have the effect of discriminating against foreign goods, and the Supreme Court has made clear that it is "[n]ot the tax in a vacuum of words, but its practical consequences for the doing of interstate commerce in applications to concrete facts [that] are our concern." *Nippert,* 327 U.S. at 431, 66 S.Ct. at 593.

## IV. CONCLUSION

Today we hold that the volumetric throughput charge used by the California Lands Commission in the rental of tide and submerged lands is unconstitutional under the Commerce Clause and the Import-Ex-

does not vary significantly from the primary purpose of the Commerce Clause." *Stevedor-*

port Clause. Our holding is not, however, to be understood as invalidating all volumetric leases. We recognize that the volumetric rate must be judged by its result, not its formula. *Vanderburgh* 405 U.S. at 716, 92 S.Ct. at 1355.

AFFIRMED.

*ing,* 435 U.S. at 754, 98 S.Ct. at 1400.