LAY, Circuit Judge,
dissenting.
With all due respect, the fundamental flaw in the majority’s reasoning is the manner in which it frames the issue. The majority asks whether the state of South Dakota, in exclusively favoring its residents in the operation of a video lottery business, is acting as a “market participant” or a “market regulator.” Upon finding that the state is a market participant in the video lottery business (indeed, it operates a monopoly) on account of its substantial investment in a central computer, software, and related expenses, the court declares it immune from Commerce Clause restrictions.[6]
The difficulty with the majority’s stated approach is that it fails to ask whether, while acting as a market participant, the state has also illegally attempted to regulate the market. As the Second Circuit has explained, “[cjourts must evaluate separately each challenged activity of the state to determine whether it constitutes participation or regulation.” USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1282 (2d Cir.1995), cert. denied, — U.S. -, 116 S.Ct. 1419, 134 L.Ed.2d 544, and, cert. denied, — U.S. -, 116 S.Ct. 1452, 134 L.Ed.2d 571 (1996). Dissenting in Reeves, Justice Powell echoed this truism when he observed that “[s]tate action burdening interstate trade is no less state action because it is accomplished by a public agency authorized to participate in the private market.” Reeves, Inc. v. Stake, 447 U.S. 429, 451, 100 S.Ct. 2271, 2285, 65 L.Ed.2d 244 (1980) (Powell, J, dissenting). Thus, the fact that a state may participate in the marketplace as a private firm does not mean it may otherwise regulate the market at will. Yet the majority reduces the distinction between market regulation and market participation to an either/or proposition.
The majority principally relies on Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976), and Reeves, 447 U.S. at 436, 100 S.Ct. at 2277. In neither of these cases, however, did the state exercise any regulatory authority resulting in a policy of discrimination. See Reeves, Inc. v. Kelley, 603 F.2d 736, 737 (8th Cir.1979) (noting the complete absence of an “allegation that South Dakota regulated or restricted out-of-state sale of privately manufactured cement or exercised its police power to suppress competition in the manufacture or sale of cement”), aff'd, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980).[7] More *1117 importantly, Wyoming v. Oklahoma, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), directly refuted the majority’s analysis. There the Court struck down an Oklahoma statute which required all public and private utilities within the state to supply ten percent of their fuel needs from Oklahoma-mined coal. While acknowledging that Oklahoma, as a participant in the coal market, could purchase coal from whomever it chose, id. at 461, 112 S.Ct. at 804, the Court invalidated Oklahoma’s regulatory conduct in imposing purchase requirements upon private utilities. Id. at 454-59, 112 S.Ct. at 800-03.[8]
In discussing Wyoming v. Oklahoma, the majority takes comfort in the Supreme Court’s observation that were the Oklahoma law construed to apply only to the state-owned public utility (Grand River Dam Authority) (GRDA) the statute “would become a fundamentally different piece of legislation.” Ante at 1113 (citing Wyoming v. Oklahoma, 502 U.S. at 461, 112 S.Ct. at 804). If the law struck down in Wyoming v. Oklahoma were applied only to the GRDA, and the market participant exception were applied, private utilities would be free to make their own decisions from whom they might buy coal unimpeded by government regulation. In contrast, because of the way South Dakota has structured and regulated the video lottery market, private companies are not free to do business unimpeded by government regulation, without facing criminal penalties. Beyond choosing its own “business partners,” South Dakota has regulated all actors in the video lottery market by prohibiting transactions between private parties. Although South Dakota is participating in the market, its statutory commands reach beyond merely dictating terms to its “business partners,” and therefore its regulation of the video lottery market is similar to the law struck down in Wyoming v. Oklahoma.
In contrast to the analysis urged by the majority, the decisions of several other circuits support an activity-by-activity analysis where the state both regulates and participates in the relevant market. In Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, for example, the Third Circuit observed:
When a public entity participates in a market, it may sell and buy what it chooses, to or from whom it chooses, on terms of its choice; its market participation does not, however, confer upon it the right to use its regulatory power to control the actions of others in that market.
48 F.3d 701, 717 (3d Cir.1995); accord SSC Corp. v. Town of Smithtown, 66 F.3d 502, 513 (2d Cir.1995), cert. denied, — U.S. -, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996). The Second Circuit has likewise stated:
[The Town of] Babylon has exercised its governmental powers by denying licenses to all garbage haulers but the one hired by the Town, and by establishing civil and criminal penalties for haulers who collect garbage without a License. Because no private actor could engage in such activity, the Town is acting as a market regulator rather than a market participant. The Town does ‘participate’ in the garbage collection market in a different respect: it buys garbage hauling services from BSSCI. But states and local gov *1118 ernments do not enjoy carte blanche to regulate a market simply because they also participate in that market. Particular state actions that do not constitute ‘market participation’ are subject to the limitations imposed by the Commerce Clause. A state engaging in mercantile activity does not obtain blanket immunity to regulate the market in which it participates, free from the strictures of the dormant Commerce Clause.
USA Recycling, 66 F.3d at 1282 (citations omitted).
Similarly, in Western Oil & Gas Ass’n v. Cory, 726 F.2d 1340 (9th Cir.1984), aff'd without opinion by an equally divided court, 471 U.S. 81, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985), the Ninth Circuit recognized that a state’s ownership interest in a market does not exempt its regulation of the market from Commerce Clause scrutiny. Western Oil & Gas involved a California scheme to collect a volume-based “rent” from off-coast refineries for the leasing of state-owned tidelands over which they transported oil. The state contended that its leasehold activities fell outside the scope of the Commerce Clause on the basis that, as owner of the tidelands, it acted in a proprietary capacity in renting them. Id. at 1342. The court rejected that argument:
The State owns and controls tidelands and submerged lands in its sovereign capacity. Although some of the lands are in the possession of local State entities or private interests, this does not mean that California becomes one of many competitors. The permanency of plaintiffs’ facilities does not permit them to “shop around”. There is no other competitor to which they can go for the rental of the required strip of California coastline. The Commission has a complete monopoly over the sites used by the oil companies. The companies have no choice but to renew their leases despite the volumetric rate, as the oil, gas and petroleum-derived products cannot be transported to plaintiffs’ facilities without traversing the state-owned lands. This control over the channels of interstate commerce permits the State to erect substantial impediments to the free flow of commerce. We therefore reject the State’s contention that its leasing activities are not subject to Commerce Clause scrutiny.
Id. at 1343 (emphasis added and citations omitted).
There was no doubt in Western Oil & Gas that the state owned the tidelands over which the refineries transported their oil. Yet the fact that it wielded monopolistic power, and as such was a market participant, did not deter the court from holding that its regulatory function was subject to dormant Commerce Clause scrutiny.
The majority dismisses Western Oil & Gas on the ground that the present case “does not involve parties who are forced to deal with the State in a monopoly situation that falls outside the reach of free market forces,” but rather “parties who are asserting they have a right to do business initially with the State, and the state determining that it does not want to do business with the parties.” Ante at 1114. This characterization slights the fact that in deciding that it “does not want to do business” with Chance, the state has also foreclosed the opportunity for Chance “to do business” with anyone else, much as the refineries in Western Oil & Gas were foreclosed from dealing with other landowners. If the rationale behind the market participant doctrine is genuinely evenhandedness, see Reeves, 447 U.S. at 439, 100 S.Ct. at 2278-79 (where “state proprietary activities” are “burdened with the same restrictions imposed on private market participants,” then “[ejvenhandedness” supports invocation of market participant doctrine), then it would seem that South Dakota must take the bitter with the sweet: it may not enter the market as a purchaser of video lottery operation services while precluding, through the use of its regulatory power, all potential competitors from entering the market.[9] If anything, the instant case presents facts more compelling than Western Oil & Gas for not applying the market participant exception, for the state has a monopoly over video lottery as a *1119 direct result of its own regulations, and not merely by “happenstance.”[10] See Reeves, 447 U.S. at 444, 100 S.Ct. at 2281; see also C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 388, 391, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994) (“With respect to this stream of commerce, the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town.”); id. at 392, 114 S.Ct. at 1683 (“[T]hat the flow control ordinance favors a single local proprietor ... just makes the protectionist effect of the ordinance more acute.”).
There should be little question in the present case that South Dakota is not simply exercising a private choice as to the parties with whom it will trade.[11] Indeed, by its own constitutional and legislative enactments the state concedes that it is regulating the market.[12] Pursuant to the constitutional grant of authority within Section 25, the South Dakota legislature has delegated to the South Dakota Lottery Commission the “overall management” and “control over the operation of [lottery] games.” S.D. Codified Laws Ann. § 42-7A-2 (Michie Supp.1995). Likewise, § 42-7A-21 authorizes the Commission to promulgate “[r]ules and regulations” concerning seventeen aspects of the lottery, including “[a]dditional qualifications for ... operators, ... the amount of application fees to be paid,” id. § 42-7A-21(7), and “[l]icensing procedures,” id. § 42-7A-21(16). As South Dakota admits in its brief: “The State’s involvement in video lottery is pervasive. Virtually every aspect of video lottery operations is owned, operated, specified, controlled or monitored by the State.” Brief for Appel-lees at 12.
Although the majority asserts that South Dakota “is free to choose those with whom it will deal, be it through licensure or contract,” ante at 1113, the granting and denial of licenses is far more akin to market regulation than to market participation. Public licen-sure is not generally contractual in nature: a license neither grants the licensee a property right nor creates a mutual obligation[13] If *1120 anything, public licensing constitutes a “primeval governmental activity” such as the taxation scheme favoring in-state residents found to fall outside of the market participant exception in Limbach, 486 U.S. at 277, 108 S.Ct. at 1809-10.
The state concedes that licensing normally entails authorizing private “individuals to pursue private occupations that demand a minimum level of proficiency, skill and competency,” but contends that its lottery licensing regime merely “provides the individual or business with the ability to participate in the State’s video lottery business enterprise.” Brief for Appellees at 16. This assertion (which is unsupported by any authority) is dubious, given the substantial eligibility requirements delineated in S.D. Codified Laws Ann. §§ 42-7A-13 and 42-7A-14 (Michie Supp.1995). The granting and denial of public licenses clearly constitutes market regulation. See Reeves, 447 U.S. at 440, 100 S.Ct. at 2279; cf. Richard A Epstein, The Permit Power Meets the Constitution, 81 Iowa L.Rev. 407, 414 (1995) ([“N]o matter how generous a view one takes of the permit power, one still must distinguish between the state as regulator and the state as owner. Quite bluntly, the power to issue a permit does not — or at least should not — make the state a part owner of the property.”).
The state’s unilateral decision to increase its share of video lottery revenues from 35 to 50 percent also detracts from its argument that it is not regulating the video lottery market. See S.D. Codified Laws Ann. § 42-7A-63 (Michie Supp.1995). In a competitive market, such an increase in a licensor’s share of revenues would normally be the product of bilateral negotiations in which the possibility of losing the licensee to a competitor would serve to limit the licensor’s bargaining power. Here, however, the state has no competitors, for it has erected a legal barrier to then-entry into the video lottery market. Private entities enjoy no such comparable power. See SSC Corp., 66 F.3d at 512 (“A state’s actions constitute ‘market participation’ only if a private party could have engaged in the same actions.”). Characterizing the state’s activity as a “refusal to deal” with nonresident corporations is therefore misleading. Compare United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) (“In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.”) with Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684 (1927) (finding refusal to deal “in pursuance of a purpose to monopolize” illegal under the Sherman Act). Cf. Epstein, supra at 416 (“In ordinary markets, if you don’t like the terms that people offer, you can go elsewhere. But there is no effective exit right when the state asserts its permit power. The state, which has a stranglehold on individual behavior, must be told to relax its grip.” (footnote omitted)).
To be sure, South Dakota “participates” at some level in the video lottery market each time it “contracts” with a state-licensed video lottery operator, and the majority is quite correct to reject Chance’s argument that the market participant doctrine is limited to circumstances in which a state formally acts as a buyer, seller, or employer.[14] Under South *1121 Dakota’s licensing scheme, however, only corporations owned in their majority by residents are permitted to enter the video lottery market; nonresident-owned corporations are “removed from the market altogether,” Reeves, 447 U.S. at 444 n. 17, 100 S.Ct. at 2281 n. 17, for one may not operate a video lottery machine without a license, and doing so is in fact punishable as a felony. See S.D. Codified Laws Ann. § 42-7A-39 (1991). Imposing criminal penalties may not fairly be considered an act of a market participant. See SSC Corp., 66 F.3d at 612. Pursuant to its state constitution, South Dakota is the exclusive “purchaser” of video lottery operation services; there is no residual market in which Chance might sell its services, nor is there any residual purchaser who might buy them. See S.D. Const. Art. III, § 25 (“The Legislature shall not authorize any game of ... lottery_”).[15] South Dakota’s activity therefore bears all of the hallmarks of public licensing and regulation, and it is inaccurate to characterize its video lottery arrangement as market “participation.” See Wunnicke, 467 U.S. at 97, 104 S.Ct. at 2245 (plurality opinion) (market participant doctrine “does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity”).
Under the scheme set out by the South Dakota legislature, it should be obvious that the state is using its police powers to regulate the video lottery in a manner that precludes an evenhanded comparison to a private entrepreneur. There is little question that its “regulatory measures [are] impeding free private trade in the national marketplace.” Reeves, 447 U.S. at 487, 100 S.Ct. at 2277. Unfortunately, Chance has no opportunity to compete on equal footing with the state.
I must, therefore, respectfully dissent.

. The Commerce Clause restricts the states in discriminating against interstate commerce. Thus, the Supreme Court has generally recognized that the " 'negative' aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.” New Energy Co. v. Limbach, 486 U.S. 269, 273-74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988).

. Indeed, the Supreme court in Reeves expressly distinguished such cases in observing that:
*1117 South Dakota has not sought to limit access to the State’s limestone or other materials used to make cement. Nor has it restricted the ability of private firms or sister States to set up plants within its borders. Moreover, petitioner has not suggested that South Dakota possesses unique access to the materials needed to produce cement.
447 U.S. at 444 (citation and footnote omitted).
Likewise, the Court in Hughes upheld Maryland’s subsidization of the in-state automobile scrap metal processing market on the ground that, while the "practical effect” of the challenged scheme "was that the movement of hulks in interstate commerce was reduced,” it “did not accomplish this effect directly.” 426 U.S. at 803 n. 13, 96 S.Ct. at 2495 n. 13. The Court distinguished prior cases involving ”interfere[nce] with the natural functioning of the interstate .market either through prohibition or through burdensome regulation,” concluding that “Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price." Id. at 806, 96 S.Ct. at 2496.

. Because the Court found it impracticable to sever that portion of the statute governing state-owned utilities, it declared the Act as a whole unconstitutional. Id. at 459-61, 112 S.Ct. at 802-04.

. At oral argument South Dakota conceded that, if the market participant exception does not apply, its interests in regulating Chance’s activity do not withstand Commerce Clause scrutiny.

. Theoretically the refineries involved in Western Oil & Gas could have dealt with other landowners; only the cost prohibited them from so doing. Here, by contrast, entry into the market is not cost prohibitive, but constitutionally and statutorily forbidden.

. The majority, seemingly anxious to broaden the market in question and to minimize the scope of South Dakota’s complete monopoly in video lottery, states that South Dakota “created a state business within the gaming market,” ante at 1111, and adds that “South Dakota’s residency requirement for its own business does not preclude Chance Management from dealing with the various private gaming businesses in South Dakota.” Ante at 1114. These statements cannot soften the fact that South Dakota made itself the only "partner” with whom plaintiffs may enter the video lottery business. To suggest that the plaintiffs can merely go elsewhere into other private gaming is a tacit admission that the state has regulated the video lottery market, and seems to ignore the majority's own command that the court's inquiry is limited to analyzing a narrowly defined market.

. Article III, § 25 of the South Dakota Constitution, for example, provides in relevant part:
The Legislature shall not authorize any game of chance lottery, or gift enterprise, under any pretense, or for any purpose whatever.... However, it shall be lawful for the Legislature to authorize by law a state lottery or video games of chance, or both, which are regulated by the state of South Dakota, either separately by the state or jointly with one or more states, and which are owned and operated by the state of South Dakota, either separately by the state or jointly with one or more states or persons, provided any such video games of chance shall not directly dispense coins or tokens. However, the Legislature shall not expand the statutory authority existing as of June 1, 1994, regarding any private ownership of state lottery games or video games of chance, or both. The Legislature shall establish the portion of proceeds due the state from such lottery or video games of chance, or both, and the purposes for which those proceeds are to be used. SDCL 42-7A, and its amendments, regulations, and related laws, and all acts and contracts relying for authority upon such laws and regulations, beginning July 1, 1987, to the effective date of this amendment, are ratified and approved.

.One authority defines “license" (in part):
A permit, granted by an appropriate governmental body, generally for a consideration, to a person, firm, or corporation ... to carry on some business subject to regulation under the police power. A license is not a contract between the state and the licensee, but is a mere personal permit. Neither is it property or a property right.
Black’s Law Dictionary 829 (5th ed. 1979) (citations omitted). The final phrase in the quoted passage is helpful in light of the public policy declaration found in S.D. Codified Laws Ann. § 42-7A-56(3) (Michie Supp.1995):
*1120 No applicant for a license or other affirmative commission action has any right to a license or to the granting of the approval sought. Any license issued or other commission approval granted pursuant to the provisions of this chapter is a revocable privilege, and no holder acquires any vested interest or property right therein or thereunder.
Accordingly, this section too suggests the state’s licensing scheme is regulatory, not proprietary, in nature, for a contract creates bargained for rights and obligations. Compare, e.g., Rushmore State Bank v. Kurylas, Inc., 424 N.W.2d 649, 653 (S.D.1988) (noting that "there are property rights in the [liquor] license as between the licensee and third parties such as creditors,” but “there clearly is no general property right in the license in South Dakota as between the state and the licensee”) with Black's Law Dictionary at 291-92 (5th ed. 1979) (defining “contract” (in part) as "[a]n agreement between two or more persons which creates an obligation to do or not to do a particular thing. Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.”).

. See South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97, 104 S.Ct. 2237, 2245, 81 L.Ed.2d 71 (1984) (plurality opinion) ("privity of *1121 contract is not always the outer boundary of permissible state activity”); White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 211 n. 7, 103 S.Ct. 1042, 1046 n. 7, 75 L.Ed.2d 1 (1983) (“[T]he Commerce Clause does not require the city to stop at the boundary of formal privity of contract.”); Reeves, 447 U.S. at 438 n. 10, 100 S.Ct. at 2278 n. 10 (noting that "States may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal"); Reeves, 603 F.2d at 737 n. 1 (a state possesses “ 'unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases' ” (quoting Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940)), aff'd, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); Independent Charities of Am., Inc. v. Minnesota, 82 F.3d 791, 799 (8th Cir.1996) (finding "no well-founded reason to constrict the proprietary activities covered by the market participant exception to acts of buying or selling”).

. The baseline against which the state’s activity should be measured is therefore not a market open to nonresident competitors, but a completely foreclosed market. See Reeves, 447 U.S. at 444 n. 17, 100 S.Ct. at 2281 n. 17 ("The ‘bottom line’ of the scheme closely parallels the result in Alexandria Scrap: out-of-state concrete suppliers are not removed from the market altogether; to compete successfully with in-state competitors, however, they must achieve additional efficiencies or exploit natural advantages such as their location to offset the incremental advantage channeled by the State’s own market behavior to in-state concrete suppliers.”).