626 F.Supp. 1271 (1986)
INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS, PACIFIC MARITIME REGION, a labor organization, Plaintiff,
v.
Eleanor ANDREWS, Commissioner of Administration of the State of Alaska; Richard J. Knapp, Commissioner of the Department of Transportation and Public Facilities of the State of Alaska; Martin Nusbaum, Director of Administrative Support of the Division of Marine Highway Systems of the State of Alaska; and John Doe officers Two through Ten, officers of the State of Alaska, Defendants.
Kurt K. PETRICH, Robert W. Seidman, John W.S. Lam, William P. Turner, Sandra Jenson, Grant R. Webber, Ronald P. Tyrell, Mike McRoberts, David Roberts, Robert E. Smith, Frank R. Ewing, Pierre L. Rutledge, Lawrence E. Markham, Arlene G. Sheets, Paul K. Judd, David Lisle, Patrick Kangas, William Petrich, Clement Wischinski, Donald E. Besse, David Kutz, Robert Chamberlain, Victor Freise, Wallace Blackwell, Billie Alsup, Jr., Charles H. Knight, Plaintiffs,
v.
Eleanor ANDREWS, Commissioner of Administration of the State of Alaska; Richard J. Knapp, Commissioner of the Department of Transportation and Public Facilities of the State of Alaska; Martin Nusbaum, Director of Administrative Support of the Division of Marine Highway Systems of the State of Alaska; and John Doe officers Two through Ten, officers of the State of Alaska, Defendants.
No. A82-465 CIV.
United States District Court, D. Alaska.
January 30, 1986.
*1272 *1273 Richard S. Oettinger, Seattle, Wash., and James B. Bradley, Juneau, Alaska, for plaintiff IOMMP.
Kelby D. Fletcher, Peterson, Bracelin & Young, Seattle, Wash., for individual plaintiffs.
Laura L. Davis, Asst. Atty. Gen., Juneau, Alaska, for defendants.

OPINION
FITZGERALD, Chief Judge.
The Alaska Marine Highway System (AMHS) is owned and operated by the State of Alaska through its Department of Transportation and Public Facilities, and operates ferries transporting passengers, mail, and personal and commercial motor vehicles between Seattle and Alaska, as well as between various Alaskan ports. In 1977, the Alaska Legislature amended the Alaska Public Employment Relations Act, AS 23.40.210 (1985), and provided for cost-of-living wage differentials between AMHS's Alaska-resident and nonresident employees. The International Organization of Masters, Mates, and Pilots, Pacific Maritime Region (IOMMP), which is the collective bargaining representative for sixty-five to seventy AMHS licensed deck officers, and twenty-six other AMHS employees belonging to the Inland Boatman's Union (IBU) brought these actions to challenge the constitutionality of the wage differentials.[1] They claim that the differentials violate the federal constitution's commerce clause, U.S. Const. art. I, § 8, cl. 3, equal protection clause, U.S. Const. amend. XIV, § 1, and privileges and immunities clause, U.S. Const. art. IV, § 2, cl. 1, and that they operate to deprive the plaintiffs of the "right to travel" guaranteed by the fourteenth amendment.[2]
*1274 The plaintiffs seek declaratory and injunctive relief, as well as money damages.[3] The defendants, Alaska state officials who administer AMHS, maintain that AS 23.40.210 is constitutionally sound. The parties have both moved for summary judgment. I grant the defendants' motion for summary judgment.

FACTUAL BACKGROUND
Alaska began to operate AMHS in 1962. At present, AMHS is the only public surface transportation system connecting the various communities in southeast Alaska, as well as many communities in southwest Alaska. Since most of these communities are inaccessible by road, AMHS provides the primary means of supplying their residents with food and other essential commodities. The annual operating expenses of AMHS substantially exceed the annual revenues it generates; as a result, each year during its budget process, the State allocates funds out of its general revenues to cover the difference. See AS 37.07 (1985) (Executive Budget Act).
When Alaska established AMHS in 1962, it based the wage schedule for AMHS employees on prevailing wages for comparable work in California, Oregon, and Washington, and added 25% to offset what was then assumed to be the higher cost of living in Alaska. A 1980 comparative-wage study revealed that IOMMP members working on AMHS earned between 35 and 40% more than their fellow union members working on the Washington state ferry system. The record suggests that at least part of this disparity in wage levels was attributable to the significantly more demanding job requirements and work shifts on AMHS compared with the Washington system.
According to statistics in the record supplied by federal agencies, the cost of living in Anchorage in 1980 for a typical family of four was at least 22.5% higher than that in Seattle. See U.S. Department of Labor, Bureau of Labor Statistics, "Autumn, 1980 Urban Family Budgets and Comparative Indexes for Selected Urban Areas" (1981).[4] The cost of living in Juneau during 1980 was approximately the same as that in Anchorage. See U.S. Office of Personnel Management, Cost of Living Allowance Program, "Cost of Living Surveys for Juneau and Anchorage, 1980" (1981). Alaska has prepared studies concerning the relative cost of living in cities throughout the state, and these indicate that the cost of living in both Juneau and Ketchikan is substantially the same as that in Anchorage, while the cost of living in other southeastern cities such as Petersburg, Sitka, and Haines is slightly higher. See State of Alaska Department of Administration, Division of Personnel, "Election District Pay Differentials" (1970); see also AS 39.27.020 (1985) (establishing "pay step differentials" for unrepresented state employees "by election district and in other states": employees residing in Juneau, Ketchikan, Petersburg, and Sitka are paid on the same *1275 scale as those in Anchorage, while those living in Haines are paid one step higher).
The plaintiffs have not offered any evidence that the cost of living in Anchorage and southeastern Alaska is less than 22.5% higher than that in Seattle. Nor have they offered any evidence that the cost of living in other parts of Washington state or other places where AMHS employees reside is higher than that in Seattle. Thus, the evidence in the record indicates that the cost of living in Anchorage and southeastern Alaska is at least 22.5% higher than that in Seattle and the other areas where AMHS's nonresident employees reside.
The plaintiffs have offered evidence that the Consumer Price Index, which measures the rate the cost of living has increased in various cities since 1967, was greater for the Seattle-Everett area in 1979 than for Anchorage. See U.S. Department of Labor, "Consumer Price Index for Urban Consumers" (1979 and 1983 editions). Moreover, they have shown that between 1979 and 1983, the Consumer Price Index increased 35% more in Seattle-Everett than in Anchorage. Nevertheless, even with this faster growth in Seattle's cost of living in recent years, nothing in the record indicates that the difference in the cost of living between Anchorage and Seattle has ever fallen below 22.5%.
Both state and federal employees in Alaska have long received wage adjustments to compensate them for the relatively high cost of living in the state. As of 1981, federal employees in Alaska received a cost-of-living allowance that ranged from a minimum of 10% of their base salaries (for those without commissary privileges) or 17.5% (for those without such privileges) to a maximum of 25% of their base salaries, depending upon the employee's duty station. The State has adjusted the wages paid to its unrepresented nonmaritime employees since 1966, depending upon the cost of living in each employee's election district. AS 39.27.020 provides that such employees residing outside the state be paid six steps  currently about 22.5%  less than those employees living in Anchorage, Juneau, or Ketchikan. See AS 39.27.020. In 1972, with the passage of the Alaska Public Employment Relations Act, AS 23.40.070-23.40.260, the State initiated collective bargaining with its nonmaritime, union employees; since then, Alaska has negotiated cost-of-living wage adjustments in all its collective bargaining agreements with nonmaritime unions. By 1977, the only collective bargaining agreements for Alaska state employees that did not contain cost-of-living adjustments in the pay plan were those negotiated with the three maritime unions working on AMHS.[5]
In 1977, the Alaska legislature amended AS 23.40.210. Although the 1977 amendment required that all state collective bargaining agreements include cost-of-living wage differentials, it was clearly targeted at the three AMHS unions, since their bargaining agreements were the only ones involving state employees that did not already include cost-of-living adjustments. As amended, AS 23.40.210 provides that:
Upon the completion of negotiations between [a labor] organization and a public employer, if a settlement is reached, the employer shall reduce it to writing in the form of an agreement.... The agreement shall include a pay plan designed to provide for a cost of living differential between the salaries paid employees residing in the State and employees residing outside the State. The plan shall provide that the salaries paid, as of August 26, 1977, to employees residing outside the State shall remain unchanged until the difference between those salaries and the salaries paid employees residing in the State reflects the difference between the cost of living in Alaska and living in Seattle, Washington....
AS 23.40.210 (emphasis added). The Alaska House Finance Committee's "letter of intent" concerning the 1977 amendment confirms that its primary purpose was to *1276 introduce cost-of-living wage differentials for AMHS employees:
It is the intent of the House Finance Committee in passing the 1977 amendment to provide for a cost-of-living pay differential between Alaska Marine Highway employees who live in Alaska and those who live outside the state. The purpose of the bill is to encourage employees of the Marine Highway System to live in Alaska. It is not intended to mandate a pay raise or benefits increase for resident Ferry system employees. Rather, the differential should be implemented over a period of time through the collective bargaining process. For example, if the cost of living in Ketchikan is 15% higher than in Seattle, and a 6% increase were negotiated, the 6% raise  and subsequent raises  should apply only to Alaska residents until the cost-of-living differential is established. ...
1977 State of Alaska House Journal 461.
As the amendment's legislative history indicates, the main reason for introducing cost-of-living differentials was to "encourage [AMHS] employees ... to live in Alaska." According to the defendants, prior to the passage of the 1977 amendment, AMHS employees who remained or became Alaska residents were making a conscious and substantial sacrifice, given how much greater purchasing power their wages would have if they moved to Washington or other states.
State officials testified in affidavits that there are advantages to having Alaska residents employed on AMHS. They assert that crew members from southeast Alaska are acutely aware of the importance of ferry service in supplying necessities to their communities, and therefore may be more committed than other employees to providing high-quality, dependable service, and less likely to endorse strikes that interrupt service. They also maintain that since AMHS employees represent Alaska to nonresident visitors and tourists, it is desirable from a public relations and tourism standpoint that at least some of these employees be Alaska residents with a demonstrated commitment to the state. The defendants contend that since there is a value to having at least some Alaska residents as AMHS employees, the State should be permitted to alleviate conditions that discourage AMHS employees from remaining or becoming Alaska residents. They maintain that AS 23.40.210's cost-of-living differentials enable Alaska to compete on an even footing with Washington and other states to be the residence-state of AMHS employees.
As the legislative history also indicates, AS 23.40.210's cost-of-living wage differentials were intended to be phased in over time as new collective bargaining agreements were negotiated: the salaries of AMHS's nonresident employees were not to be immediately or drastically reduced, or those of resident employees immediately raised. Alaska attempted to implement the cost-of-living differentials for the first time in its 1979 negotiations with AMHS unions, and began to incorporate the differentials in its 1980 labor agreements.
All base wage increases that the State has granted since July, 1979 have been limited exclusively to resident employees, although all employees have received some indirect increases in compensation and benefits. Thus, while nonresident employees' base wages have remained the same since 1979, the base wages of IOMMP's Alaska-resident members have increased 11 to 13%, those of IBU's resident members have increased 18 to 25%, and those of MEBA's resident members have increased 22.5%. The IOMMP's labor agreements since 1979 have all included a provision that if AS 23.40.210 is found unconstitutional, nonresident union members will receive the back wages and wage increases they would have received had they been Alaska residents.
The plaintiffs contend that AS 23.40.210's cost-of-living wage differentials are unfair and unconstitutional.[6] They maintain *1277 that the existence of these differentials has operated to coerce many AMHS nonresident employees to move to Alaska, noting that when the IOMMP filed suit in 1980, 34 of its 65 members working on AMHS were nonresidents (32 from Washington, mostly from around Seattle, and 1 each from California and Wisconsin), but that by 1983, only 24 of 69 IOMMP members working on AMHS were nonresidents.[7] Moreover, the plaintiffs have introduced evidence that at least some Alaska-resident employees of AMHS want to emigrate from the state, but feel compelled to remain because of the cost-of-living differentials.
The plaintiffs note that although AMHS's nonresident employees' wages have been "frozen" since 1979, the Consumer Price Index indicates that the cost of living in Seattle has grown faster since 1979 than that of Anchorage. They contend that the cost-of-living adjustment provided by AS 23.40.210 is not precisely enough tailored: it differentiates simply between the class of all Alaska residents, whose wage levels are uniformly based on the cost of living in Anchorage, and the class of all nonresidents, whose wages are based on the cost of living in Seattle, and it does not take into account differences in the cost of living either within Alaska or throughout the rest of the United States. The plaintiffs maintain that there is no evidence indicating that nonresident employees are harmful to AMHS or less qualified as a group than resident employees. They also note that both the IOMMP and the IBU already have clauses in their labor agreements providing for preferential hiring of Alaska residents, and they contend that these hiring preferences alone are sufficient to guarantee that Alaska residents will be well-represented on AMHS, without the added "preference" of cost-of-living differentials.

ANALYSIS
The plaintiffs contend that by "freezing" the wages of AMHS's nonresident employees and authorizing wage increases only to AMHS's Alaska-resident employees, AS 23.40.210 violates the federal constitution's commerce clause, equal protection clause, and privileges and immunities clause, and violates AMHS employees' "right to travel" under the fourteenth amendment. I do not agree. I therefore grant the defendants' motion for summary judgment.

A. COMMERCE CLAUSE CLAIMS
The plaintiffs contend that AS 23.40.210's imposition of cost-of-living wage differentials violates the commerce clause. However, when a state acts in a proprietary capacity as a "market participant," rather than as a "market regulator," it is not subject to the limitations of the commerce clause, even if it uses its position "`to favor its own citizens over others.'" White v. Massachusetts Council of Construction Employers, Inc., 460 U.S. 204, 206-08, 103 S.Ct. 1042, 1044-45, 75 L.Ed.2d 1 (1983) (quoting Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976)); accord South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1984); Reeves, Inc. v. Stake, 447 U.S. 429, 436-40, 100 S.Ct. 2271, 2277-79, 65 L.Ed.2d 244 (1980); Western Oil and Gas Association v. Cory, 726 F.2d 1340, 1342-43 (9th Cir.1984), aff'd by equally divided court sub nom. Cory v. Western Oil and Gas Association, ___ U.S. ___, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985); see United Building and Construction *1278 Trades Council v. Mayor and Council of Camden (hereinafter "Camden"), 465 U.S. 208, 213, 220, 104 S.Ct. 1020, 1024, 1028, 79 L.Ed.2d 249 (1984).
In operating AMHS, a state-owned business, and determining the wages to pay AMHS's employees, Alaska has acted as a "market participant," not as a "market regulator." See, e.g., White, 460 U.S. at 214-15, 103 S.Ct. at 1048 (city acted as market participant when it contracted with firms for construction of public projects); Reeves, 447 U.S. at 440, 100 S.Ct. at 2279 (state acted as market participant when it sold cement produced at state-operated plant only to its own residents); Hughes, 426 U.S. at 809-10, 96 S.Ct. at 2497-98 (state operated as market participant in paying bounties for recycling of abandoned automobiles). The only market directly affected by Alaska's payment of cost-of-living adjustments to AMHS's resident employees is the labor market for the maritime transportation industry, in which Alaska is clearly a participant. The record does not indicate that AS 23.40.210 has caused "a substantial regulatory effect outside of that particular market." South-Central Timber, 104 S.Ct. at 2245-46 (emphasis added). Therefore, the plaintiffs' claims based upon the commerce clause must fail, regardless of any impact AS 23.40.210's wage differentials may have upon AMHS's nonresident employees. See White, 460 U.S. at 210, 103 S.Ct. at 1046.

B. "RIGHT TO TRAVEL" CLAIMS
The plaintiffs contend, based upon the Supreme Court's decisions in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), that by imposing wage differentials according to AMHS employees' states of residence, AS 23.40.210 infringes upon their "right to travel" guaranteed by the fourteenth amendment. The plaintiffs maintain that like the state statutes containing residence requirements that the Supreme Court invalidated in Shapiro, Dunn, and Memorial Hospital, AS 23.40.210 penalizes their exercise of the "right to travel," and must therefore be reviewed under a strict scrutiny standard. I disagree. I conclude that AS 23.40.210's wage differentials do not penalize interstate travel, and thus do not require strict scrutiny review.
First, the wage differentials do not penalize AMHS employees who migrate to Alaska. Unlike the statutes invalidated in Shapiro, Dunn, and Memorial Hospital, AS 23.40.210 does not contain a durational residence requirement: it does not condition receipt of a state benefit upon a minimum period of residence within the state. See Memorial Hospital, 415 U.S. at 251, 94 S.Ct. at 1078 (imposing one-year county residence requirement); Dunn, 405 U.S. at 334, 92 S.Ct. at 999 (one-year state residence and three-month county residence requirements); Shapiro, 394 U.S. at 622, 89 S.Ct. at 1324-25 (one-year state residence requirement). AMHS employees qualify for the cost-of-living adjustment at the moment they become bona fide residents of Alaska. See AS 23.40.210; see also Martinez v. Bynum, 461 U.S. 321, 325-29, 103 S.Ct. 1838, 1841-43, 75 L.Ed.2d 879 (1983).
The Supreme Court and other courts have distinguished between statutes like AS 23.40.210, which require only that individuals demonstrate bona fide, continuing residence in a state to qualify for benefits, and statutes like those in Shapiro, Dunn, and Memorial Hospital, which imposed durational residence requirements. Most, if not all, courts have concluded that statutes without a durational residence requirement do not "penalize" exercise of the "right to travel." See Martinez, 461 U.S. at 325-29, 103 S.Ct. at 1841-43; McCarthy v. Philadelphia Civil Service Commission, 424 U.S. 645, 646-47, 96 S.Ct. 1154, 1155, 47 L.Ed.2d 366 (1976) (per curiam); Benson v. Arizona State Board of Dental Examiners, 673 F.2d 272, 277 (9th Cir.1982); Hawaii Boating Association v. Water Transportation Facilities Division, 651 F.2d 661, 664 (9th Cir.1981); Fisher v. Reiser, *1279 610 F.2d 629, 635 (9th Cir.1979), cert. denied, 447 U.S. 930, 100 S.Ct. 3029, 64 L.Ed.2d 1124 (1980). Since AS 23.40.210 does not require that AMHS employees reside in Alaska for any set period before becoming eligible for the cost-of-living adjustment, I conclude that it imposes no "penalty" upon AMHS employees who migrate to Alaska.[8] If anything, the statute facilitates migration by these individuals to Alaska, because it removes the disincentive to migration resulting from Alaska's relatively high cost of living.
Second, AS 23.40.210's wage differentials do not penalize AMHS employees who emigrate from Alaska to other states. The Ninth Circuit has indicated that in actions alleging denial of individuals' "right to travel," "`the "penalty" [on interstate travel] required to invoke strict scrutiny [must] involve[] a genuinely significant deprivation, such as a denial of the basic "necessities of life" ... or the denial of a "fundamental political right."'" Hawaii Boating Association, 651 F.2d at 665 (citation omitted and emphasis in original); Fisher, 610 F.2d at 635-36. Unlike the statutes in Shapiro, Dunn, and Memorial Hospital, AS 23.40.210 does not deny necessities of life or fundamental political rights to nonresidents or any other group. See Memorial Hospital, 415 U.S. at 258-62, 94 S.Ct. at 1082-84 (withholding public medical assistance payments); Dunn, 405 U.S. at 336-42, 92 S.Ct. at 999-1003 (restricting right to vote); Shapiro, 394 U.S. at 622, 633-38, 89 S.Ct. at 1324-25, 1330-33 (withholding public assistance); see also Hawaii Boating Association, 651 F.2d at 664-65; Fisher, 635-36. It does not deprive AMHS's nonresident employees of their jobs or prevent them from earning salaries that compare favorably with those for similar employment in their own states; in fact the only state "benefit" it withholds from nonresidents is the cost-of-living wage adjustment.[9] According to the statistical comparisons in the record, this wage adjustment does not constitute a benefit at all, because it merely "equalizes" the purchasing power of AMHS employees residing in Alaska with that of AMHS employees residing outside the state.[10] I conclude that Alaska's failure to provide this wage adjustment to AMHS's nonresident employees does not constitute "a genuinely significant deprivation," Hawaii Boating Association, 651 F.2d at 665, and therefore does not penalize AMHS employees who choose to emigrate from Alaska to other states.
I note in passing that only in limited circumstances, if at all, can a "right to travel" challenge be maintained by former residents of a state who maintain that the state must continue to provide them with benefits as if they were still residents. See Califano v. Torres, 435 U.S. 1, 4-5, 98 S.Ct. 906, 908, 55 L.Ed.2d 65 (1978); Fisher, 610 F.2d at 634-35; cf. Alaska Pacific *1280 Assurance Co., 687 P.2d at 269-74. States are entitled to provide direct benefits to their citizens in order to "make residence within [their] boundaries more attractive." Zobel v. Williams, 457 U.S. 55, 67, 102 S.Ct. 2309, 2316, 72 L.Ed.2d 672 (1982) (Brennan, J., concurring). Bestowing such benefits on state residents, as AS 23.40.210 is alleged to do, does not violate their "right to travel" merely because it makes the prospect of remaining in the state more attractive or eliminates disincentives to moving away. See Califano, 435 U.S. at 4, 98 S.Ct. at 908; Fisher, 610 F.2d at 634.
Because I conclude that the wage adjustments provided in AS 23.40.210 do not penalize AMHS employees for migrating to or emigrating from Alaska, I conclude that the statute does not infringe upon the "right to travel." Therefore, AS 23.40.210 need not be reviewed under the strict scrutiny standard.

C. EQUAL PROTECTION CLAIMS
The plaintiffs also contend that the wage differentials imposed by AS 23.40.210 violate the equal protection clause of the fourteenth amendment. I do not agree. Since AS 23.40.210 differentiates between the wages paid to state residents and nonresidents working on AMHS, it must satisfy the requirements of the equal protection clause. See Hooper v. Bernalillo County Assessor, ___ U.S. ___, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985). However, because AS 23.40.210 does not penalize the "right to travel," burden any other fundamental right, or discriminate against a suspect class, it is reviewed under the "rational basis" standard, and will be invalidated "only if no grounds can reasonably be conceived to justify it." Benson, 673 F.2d at 278; Hawaii Boating Association, 651 F.2d at 666; see Hooper, 105 S.Ct. at 2866; Williams v. Vermont, ___ U.S. ___, 105 S.Ct. 2465, 2472, 86 L.Ed.2d 11 (1985); Metropolitan Life Insurance Co. v. Ward, ___ U.S. ___, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985); Fisher, 610 F.2d at 636; see also Baldwin v. Montana Fish and Game Commission, 436 U.S. 371, 388-91, 98 S.Ct. 1852, 1862-64, 56 L.Ed.2d 354 (1978). I conclude that the Alaska legislature "could have reasonably concluded that the [wage differentials] would promote a legitimate state purpose," Williams, 105 S.Ct. at 2472; Metropolitan Life, 105 S.Ct. at 1683, and therefore reject the plaintiffs' equal protection challenge.
As noted above, the wage differentials imposed by AS 23.40.210 are designed to eliminate the economic disincentive to AMHS employees residing in Alaska that results from the state's high cost of living, and thus to ensure that at least some AMHS employees will be Alaska residents. The State maintains that Alaska residents employed on AMHS will represent the state to nonresident tourists and visitors travelling on AMHS, and will thereby enhance the travel experiences of these passengers and perform a valuable public relations service for the state. To the extent that these Alaskan employees reside in the communities served by AMHS, they will also be acutely aware of the local conditions and needs of these communities and may help to sensitize other members of the crew. Moreover, it is desirable from Alaska's perspective that a state-subsidized business like AMHS employ at least some state residents. I therefore find Alaska's purpose in adopting AS 23.40.210's wage differentials to be a legitimate one. See generally Hooper, 105 S.Ct. at 2866-68; Williams, 105 S.Ct. at 2472; Metropolitan Life, 105 S.Ct. at 1683; Zobel, 457 U.S. at 65, 102 S.Ct. at 2315.
The precise level of the wage differentials is roughly equivalent to the difference between the cost of living in the main Alaskan cities where AMHS employees reside (Anchorage, Juneau and Ketchikan) and that of the Seattle metropolitan area, where a majority of the nonresident AMHS employees in the IOMMP and the IBU reside. The wage differentials thus serve to equalize the purchasing power of most of AMHS's Alaska-resident employees with that of most of its nonresident employees. I therefore conclude that AS 23.40.210's wage differentials rationally further Alaska's *1281 legitimate purpose in adopting them. See generally Hooper, 105 S.Ct. at 2866-69; Williams, 105 S.Ct. at 2472; Metropolitan Life, 105 S.Ct. at 1683; Zobel, 457 U.S. at 61-64, 102 S.Ct. at 2313-15.
The plaintiffs contend that the wage differentials adopted by Alaska do not accurately reflect the differences in cost of living actually experienced by AMHS's Alaska-resident and nonresident employees. They note that many resident employees live in parts of Alaska with costs of living significantly different from that in Anchorage, upon which their wage levels are based under AS 23.40.210, and that many nonresident employees reside in cities with costs of living significantly different from that in Seattle, upon which their wage levels are based. The plaintiffs further note that since 1980, when the cost-of-living statistics relied upon by the State were compiled and when AMHS's nonresident employees' wages were first "frozen," Seattle's cost of living has increased more rapidly than Anchorage's. As a result, the plaintiffs maintain that the wage differentials adopted by Alaska under AS 23.40.210 are not tailored precisely enough to reflect economic reality, and therefore are not rational and violate the equal protection clause.
However, there is no requirement under "rational basis" analysis that state laws which do not impinge upon any fundamental interests must "`be drawn so as to fit with [absolute] precision the legislative purposes animating [them],'" Baldwin, 436 U.S. at 390, 98 S.Ct. at 1863-64 (quoting Hughes, 426 U.S. at 813, 96 S.Ct. at 2499), or that the state must "justify to the penny any [wage] differential it imposes." Id. at 391, 98 S.Ct. at 1864; accord Hawaii Boating Association, 651 F.2d at 666; Fisher, 610 F.2d at 636-37. As long as the economic means employed by the legislature were "not unreasonably related" to the purposes they were designed to serve, the fact that the legislature "`might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional.'" Baldwin, 436 U.S. at 390, 98 S.Ct. at 1863-64 (quoting Hughes, 426 U.S. at 813, 96 S.Ct. at 2499).
On the basis of the record in this case, I conclude that the wage differentials adopted by Alaska under AS 23.40.210 are "not unreasonably related" to the Alaska legislature's purpose of eliminating disincentives that will discourage AMHS employees from remaining or becoming Alaska residents. Cf. Alaska Pacific Assurance Co., 687 P.2d at 274 (invalidating, under state equal protection clause, Alaska statute that reduced benefits for workers' compensation recipients who migrated from Alaska, where reductions in benefits were based on the average weekly wage levels of their new states, rather than the differences in the cost of living between their new states and Alaska, but noting that "[i]f there were a way to equalize the buying power of benefit dollars in each state [the court] would have difficulty in concluding that [nonresident] recipients would ... suffer any penalty despite a reduction in actual dollars paid [them]") (emphasis added). The legislature has identified Alaska's relatively high cost of living as a leading disincentive to maintaining Alaska residency, and AS 23.40.210 represents a direct attempt to eliminate that disincentive.
Alaska has not been excessive in basing its wage differentials upon the relative costs of living in Anchorage and Seattle: as noted above, the record indicates that almost all Alaska-resident employees of AMHS reside in Anchorage or other cities with an almost identical cost of living, and that a majority of the nonresident employees of AMHS in the IOMMP and the IBU reside in the Seattle area. The plaintiffs have not demonstrated that the cost of living in other cities outside of Alaska where they reside is significantly higher than in Seattle, or that any of them resides in a part of Alaska significantly more expensive than Anchorage. Moreover, although the plaintiffs point out that Seattle's cost of living has risen throughout *1282 the period that their wage levels have been frozen, they have not demonstrated that Anchorage's cost of living is less than 22.5% higher than that of Seattle, or that "freezing" their wages has made their jobs on AMHS less economically desirable than most jobs they could obtain in other states. As a result, they have failed to demonstrate that AS 23.40.210's wage differentials do more than compensate for Alaska's high cost of living, or that the statute's effect is to drive them out of their AMHS positions.
Because I conclude that the existence and amount of the wage differentials imposed under AS 23.40.210 reasonably further a legitimate state purpose, I reject the plaintiffs' equal protection challenge.

D. "PRIVILEGES AND IMMUNITIES" CLAIMS
Finally, the nonresident plaintiffs contend that AS 23.40.210's wage differentials violate the privileges and immunities clause.[11] I do not agree. For a statute to violate the privileges and immunities clause, it must deny nonresidents equal treatment with respect to a right or privilege "`fundamental' to the promotion of interstate harmony." Supreme Court v. Piper, ___ U.S. ___, 105 S.Ct. 1272, 1276, 84 L.Ed.2d 205 (1985); Camden, 465 U.S. at 218, 104 S.Ct. at 1027; Baldwin, 436 U.S. at 383, 98 S.Ct. at 1860. Moreover, even if it burdens such a right, a statute will not violate the clause if "(i) there is a substantial reason for the difference in treatment [it requires]; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective."[12]Piper, 105 S.Ct. at 1279; Camden, 465 U.S. at 222, 104 S.Ct. at 1029.
I conclude that the interest "burdened" by AS 23.40.210's wage differentials is not "fundamental" in nature. Furthermore, I conclude that even if this interest were fundamental for purposes of privileges and immunities analysis, Alaska has a substantial interest in eliminating disincentives that discourage AMHS employees from residing in the state, and its wage differentials bear a "substantial relationship" to its objective of eliminating, or at least minimizing, these disincentives.
I find that the interest asserted by the nonresident plaintiffs in this action  to receive a wage adjustment based upon Alaska's cost of living, even though they continue to reside outside the state  is not a "fundamental" privilege or immunity protected by the privileges and immunities *1283 clause. The Supreme Court has held that the clause applies "`[o]nly with respect to those "privileges" and "immunities" bearing on the vitality of the nation as a single entity.'" Piper, 105 S.Ct. at 1276 (quoting Baldwin, 436 U.S. at 383, 98 S.Ct. at 1060). Although the Court has indicated that "the pursuit of a common calling is one of the most fundamental of th[e] privileges protected by the Clause," Camden, 465 U.S. at 219, 104 S.Ct. at 1028; accord Piper, 105 S.Ct. at 1276, 1277 n. 9, AS 23.40.210 does not deprive the nonresident plaintiffs of the right to seek employment as ferry employees. It therefore differs from statutes that have been held to infringe upon "fundamental" rights under the privileges and immunities clause by preventing nonresidents from pursuing their livelihoods or economic opportunities in a given state. See, e.g., Piper, 105 S.Ct. at 1276-77 (total exclusion of nonresidents from admission to state bar); Camden, 465 U.S. at 219-22, 104 S.Ct. at 1028-29 (city ordinance requiring that 40% of employees of contractors and subcontractors working on city construction projects be city residents); Hicklin v. Orbeck, 437 U.S. 518, 520, 524, 98 S.Ct. 2482, 2487, 57 L.Ed.2d 397 (1978) ("Alaska Hire" statute requiring all state oil and gas leases, easements, and contractual agreements to contain a provision "requiring the employment of qualified Alaska residents" in preference to nonresidents); Toomer v. Witsell, 334 U.S. 385, 389, 396, 68 S.Ct. 1156, 1159, 1162, 92 L.Ed. 1460 (1948) (state statute requiring nonresident shrimp fishermen to pay a license fee of $2,500 per boat and resident shrimp fishermen to pay a license fee of $25 per boat); Ward v. Maryland, 79 U.S. (12 Wall.) 418, 424-26, 20 L.Ed. 449 (1871) (state statute requiring resident traders to pay $12 to $150 for a license to do business, and nonresident traders to pay $300); Silver v. Garcia, 760 F.2d 33, 36-37 (1st Cir.1985) (Puerto Rican statute requiring applicants for insurance consultants' licenses to reside in Puerto Rico one year prior to application); Robison, 713 P.2d 259, at 265 (Alaska local hire statute requiring that work on public construction projects in the state be performed by at least 90% Alaska residents); see also Alerding v. Ohio High School Athletic Association, 779 F.2d 315, 316-19 (6th Cir.1985); Hawaii Boating Association, 651 F.2d at 666-67.
Unlike these other statutes, AS 23.40.210 does not explicitly exclude nonresidents from jobs on AMHS, cf. Piper, 105 S.Ct. at 1276-77; Hicklin, 437 U.S. at 520, 524, 98 S.Ct. at 2484, 2487; Silver, 760 F.2d at 36-37, does not limit the number or set of positions available to them, cf. Camden, 465 U.S. at 219-22, 104 S.Ct. at 1028-29; Robison, 713 P.2d 259, at 265 and does not establish higher barriers for them to satisfy than residents seeking AMHS employment, which may operate to exclude them from practicing their profession altogether. Cf. Toomer, 334 U.S. at 389, 396, 68 S.Ct. at 1159, 1162; Ward, 79 U.S. (12 Wall.) at 424-26. The statute differentiates between AMHS's resident and nonresident employees only by providing a cost-of-living wage adjustment to the resident employees.
Therefore, although the privilege at issue in this action is related to the "fundamental" privilege of pursuing employment and economic opportunities in Alaska, it is significantly narrower and must be examined separately. See Sestric v. Clark, 765 F.2d 655, 664 (7th Cir.1985) (rejecting privileges and immunities challenge to state requirement that nonresident attorneys seeking admission to state bar must pass bar exam, although nonresident attorneys moving to state could be admitted by motion, and concluding that "privilege" to be evaluated under privileges and immunities clause is not the general privilege to practice law, but merely the privilege to practice law without taking state bar exam); see also Alerding, 779 F.2d at 316-18 (rejecting privileges and immunities challenge to state bylaw barring nonresident students from participating in state interscholastic sports, and indicating that privilege at issue was right to participate in interscholastic sports, not general right to obtain an education). Moreover, the fact that Alaska owns and is subsidizing AMHS must be *1284 considered in determining whether the privilege at issue is "fundamental" under the privileges and immunities clause. See Camden, 465 U.S. at 221, 104 S.Ct. at 1029.
In light of these considerations, I conclude that the right to receive cost-of-living wage adjustments while working on AMHS is not a fundamental privilege "`bearing on the vitality of the nation as a single entity,'" Piper, 105 S.Ct. at 1276 (quoting Baldwin, 436 U.S. at 383, 98 S.Ct. at 1860), or necessary to preserve the "national economic union." Id.; see Baldwin, 436 U.S. at 388, 98 S.Ct. at 1862-63 (upholding significantly higher Montana license fees for elk hunting by nonresidents than by residents on ground that "[e]quality in access to Montana elk is not basic to the maintenance or well-being of the Union"); Alerding, 779 F.2d at 316-19 (right to participate in interscholastic sports not "fundamental" under privileges and immunities clause); Sestric, 765 F.2d at 661, 664 (privilege of practicing law without taking bar exam not fundamental); Hawaii Boating Association, 651 F.2d at 666 ("right of access, at equal rates, to mooring privileges at a recreational boat harbor is not `fundamental'"); see also Camden, 465 U.S. at 218-22, 104 S.Ct. at 1027-29. Therefore, I reject the plaintiffs' challenge to AS 23.40.210 under the privileges and immunities clause.
But even if the privilege at issue were fundamental, AS 23.40.210's wage differentials would nevertheless satisfy the requirements of the privileges and immunities clause. Alaska has demonstrated a "substantial reason" for treating AMHS's resident and nonresident employees differently: its desire to eliminate economic disincentives that discourage AMHS employees from residing in Alaska, so that at least some AMHS employees will remain or become Alaska residents. See Piper, 105 S.Ct. at 1279; Camden, 465 U.S. at 222, 104 S.Ct. at 1029-30. As noted above, given that Alaska subsidizes AMHS's operations, it is reasonable for the State to establish a wage structure that does not make it economically disadvantageous for AMHS employees to reside in Alaska. See generally Camden, 465 U.S. at 223, 104 S.Ct. at 1030. Moreover, the presence of at least some Alaska residents working on AMHS, where they will represent the state to nonresident tourists and visitors, is desirable from a public relations perspective and may enhance the experiences of those travelling on AMHS. Finally, the fact that some AMHS employees reside in the Alaskan communities served by AMHS may make them more attuned to local conditions, needs, customs, and political situations, and thus may help them to provide better service to these communities, to ease any tensions that develop between these communities and AMHS, and to adjust if emergencies arise while AMHS vessels are passing through these communities.[13]
*1285 Moreover, the cost-of-living wage differentials implemented by Alaska under AS 23.40.210 "bear[] a substantial relationship to the State's objective." Piper, 105 S.Ct. at 1279; Camden, 465 U.S. at 222, 104 S.Ct. at 1029. By their very nature, the wage differentials eliminate the economic disincentives to residing in Alaska that result from its high cost of living, without offering AMHS employees a bonus or windfall for choosing to reside in Alaska or penalizing those who choose to live in other states. Cf. Alaska Pacific Assurance Co., 687 P.2d at 274 (because differentials paid by State of Alaska were based on average wage levels, rather than cost of living, the benefits of those migrating from Alaska dropped 42% more than the reduction they actually experienced in the cost of living). It is difficult to imagine a "less restrictive means" by which Alaska could attain its objective. Piper, 105 S.Ct. at 1279; Sestric, 765 F.2d at 664. The plaintiffs contend that the use of hiring preferences for Alaska residents would be sufficient alone to ensure that a reasonable number of AMHS employees will reside in the state. However, hiring preferences do not address the crucial concern identified by Alaska in AS 23.40.210: that a uniform wage structure on AMHS creates disincentives to AMHS employees residing in Alaska, and may well lead Alaska-resident employees, once they have obtained jobs through hiring preferences, to migrate from Alaska to locations where their salaries will have greater purchasing power. Thus, the use of wage differentials appears to be the least restrictive means of meeting the State's concerns.
Furthermore, the Supreme Court has indicated that "`States [must be given] considerable leeway [under the privileges and immunities clause] in analyzing local evils and in prescribing appropriate cures,'" particularly when they are "merely setting conditions on the expenditure of funds [they] control." Camden, 465 U.S. at 222-23, 104 S.Ct. at 1029-30 (quoting Toomer, 334 U.S. at 396, 68 S.Ct. at 1162). I conclude that Alaska has demonstrated a substantial reason for establishing cost-of-living wage differentials on AMHS and has demonstrated that these bear a substantial relationship to its objective. Thus, even if the privileges at issue in this case were "fundamental" for privileges and immunities purposes, AS 23.40.210 would not violate the privileges and immunities clause.

CONCLUSION
Because I conclude that AS 23.40.210's cost-of-living wage differentials do not violate the commerce clause, the "right to travel," the equal protection clause, or the privileges and immunities clause, I grant the defendants' motion for summary judgment.
NOTES
[1] The individual plaintiffs originally challenged the constitutionality of Alaska's "Change Port" statute, AS 19.65.010, as well as the cost-of-living differentials provided under AS 23.40.210. AS 19.65.010 provided that: "No employee of the Alaska marine highway system may be relieved at a duty station or port which is outside the state." The nonresident plaintiffs claimed that by prohibiting them from beginning and concluding their shifts in Seattle, AS 19.65.010 impermissibly burdened their right to work on AMHS. However, the Alaska legislature repealed the statute in 1982. See 1982 Alaska Sess.Laws, ch. 59 § 52. Therefore, I need not determine the validity of the "Change Port" statute. See generally District No. 1, Pacific Coast District, M.E.B.A. v. Alaska, 682 F.2d 797 (9th Cir.1982).
[2] The plaintiffs have elected to challenge the cost-of-living differentials in this action exclusively under the federal constitution, and not under the Alaska state constitution. Had the plaintiffs chosen to raise a state constitutional challenge, I would have been required to consider different factors in my analysis and conceivably could have reached a different result, see Alaska Pacific Assurance Co. v. Brown, 687 P.2d 264, 269-74 (Alaska 1984); Note, Alaska Pacific Assurance Co. v. Brown: The Right to Travel and the Constitutionality of Continuous Residency Requirements, 2 Alaska Law Review 339 (1985); see also Robison v. Francis, 713 P.2d 259, at 272 (Alaska 1986) (Burke, J., concurring) ("The fact that ... a statute [may] satisfy the requirement[s] of the United States Constitution does not mean that the same statute will pass muster under ... the Alaska Constitution."), but I express no opinion on such a challenge at this time.
[3] Because I conclude that the plaintiffs' claims do not succeed on the merits, I need not decide to what extent this court could award money damages to the plaintiffs in their actions against state officials.
[4] The statistical studies in the record provided by the Bureau of Labor Statistics compare the cost of living in Anchorage and Seattle for four-person families living on relatively "lower," "moderate," and relatively "higher" budgets. The statistics indicate that in 1980, the cost of living was about 50% higher in Anchorage for families on relatively "lower" budgets, about 35% higher for families on "moderate" budgets, and about 23 to 24% higher for families on relatively "higher" budgets. See U.S. Department of Labor, Bureau of Labor Statistics, "Autumn, 1980 Urban Family Budgets and Comparative Indexes for Selected Urban Areas" (1981).
[5] The three maritime unions whose members work on AMHS are the IOMMP, the IBU, and District No. 1, Pacific Coast District, M.E.B.A. (MEBA).
[6] Since the plaintiffs have challenged AS 23.40.210's wage differentials only insofar as they apply to the three unions with members working on AMHS, rather than all Alaska public employee unions, and since, as noted above, AS 23.40.210's wage differentials were targeted specifically at the three AMHS unions, I have considered the constitutional validity of the wage differentials only as applied to the three AMHS unions. My ruling on their constitutionality is therefore limited to the facts and circumstances of the present case.
[7] The record indicates that the majority of the 26 individual IBU plaintiffs are nonresidents, and that the majority of those are from the Seattle area. There is nothing in the record concerning fluctuation of these figures during the pendency of this litigation.
[8] I note in passing that even if there were a durational aspect to AS 23.40.210, the fact that it does not result in a "significant deprivation" to nonresidents, see infra, provides an independent basis for concluding that it does not penalize AMHS employees migrating to Alaska. See Hawaii Boating Association, 651 F.2d at 665; Fisher, 610 F.2d at 635-36; see also Sosna v. Iowa, 419 U.S. 393, 406-09, 95 S.Ct. 553, 561-62, 42 L.Ed.2d 532 (1975).
[9] The plaintiffs maintain that the benefit at stake in this action is their right to employment in their chosen profession, which constitutes a fundamental right. However, the plaintiffs have not been deprived of their jobs with AMHS, nor is there anything in the record to indicate that they will be. Therefore, the only "benefit" that Alaska has denied to the plaintiffs is the right to receive the cost-of-living wage adjustment regardless of where they reside.
[10] In Fisher v. Reiser, 610 F.2d 629 (9th Cir. 1979), cert. denied, 447 U.S. 930, 100 S.Ct. 3029, 64 L.Ed.2d 1124 (1980), the Ninth Circuit rejected a "right to travel" challenge to a Nevada statute that granted cost-of-living increases to workers' compensation beneficiaries residing in the state, but did not grant those benefits to nonresident beneficiaries. Unlike AS 23.40.210, the cost-of-living adjustments provided in the Nevada statute were designed to offset inflation, not the higher cost of living in Nevada relative to other states. The Nevada statute therefore appears to have granted a more one-sided benefit to state residents than AS 23.40.210, which was designed merely to achieve parity between the purchasing power of AMHS employees residing in Alaska and those residing in other states.
[11] Only nonresidents are entitled to challenge a state's laws based upon the privileges and immunities clause. The Slaughterhouse Cases, 83 U.S. (16 Wall.) 36, 77, 21 L.Ed. 394 (1873); accord Camden, 465 U.S. at 217, 104 S.Ct. at 1027; Goldfarb v. Supreme Court, 766 F.2d 859, 864-65 (4th Cir.1985); Hawaii Boating Association, 651 F.2d at 666.
[12] In its decision in Piper, the Supreme Court conspicuously omitted any mention of the requirement, cited in many of its prior cases, that "[a]s part of any justification offered [under the privileges and immunities clause], nonresidents must somehow be shown to `constitute a peculiar source of the evil at which the statute is aimed.'" Camden, 465 U.S. at 222, 104 S.Ct. at 1029 (quoting Toomer v. Witsell, 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed.2d 1460 (1948)). Although some courts have applied the "peculiar source of the evil" test even after Piper, see Robison, 713 P.2d 259 at 264, I interpret the Piper decision as reformulating, albeit slightly, the analysis to be applied in privileges and immunities cases.

I note further that the "peculiar source of the evil" test seems especially inappropriate in a case such as the present one, where a state is merely attempting to achieve parity between its own citizens and those of other states. The "evils" that AS 23.40.210 is intended to address are Alaska's high cost of living and the resulting tendency of AMHS employees to migrate from Alaska or to remain as residents of other states. These "evils" seem systemic and largely unattributable to individual persons. To the extent that I am required to apply the "peculiar source of the evil" test in this case, however, I conclude that if nonresidents working for AMHS are paid at the same wage levels as Alaska-resident employees, they will help to deter other AMHS employees from remaining in or moving to Alaska. In this respect, nonresident AMHS employees constitute a "peculiar source of the evil[s]" at which AS 23.40.210 is directed. See generally Camden, 465 U.S. at 222, 104 S.Ct. at 1029.
[13] These reasons for seeking at least some Alaska-resident employees on AMHS are far more compelling than the justifications advanced unsuccessfully by the State of New Hampshire in Piper for totally excluding nonresidents from its state bar. Most of the qualities that New Hampshire asserted were essential to practice law in its state (i.e., familiarity with local rules and procedures, sense of ethics and concern about professional reputation, and willingness to perform pro bono and volunteer work) bore no necessary correlation to the individual attorney's state of residence, but instead merely reflected the individual attorney's diligence, professional standards, integrity and public-spiritedness. See Piper, 105 S.Ct. at 1279-80. As a result, the Supreme Court rejected the State's proferred justifications for its residence classification. See id. at 1280.

In contrast, many of the reasons offered by Alaska for eliminating practical disincentives to Alaska residency for AMHS employees (i.e., ability to represent the state, awareness of local needs and customs, and acceptance in the local communities) involve qualities that correlate to place of residence. Therefore, the State's desire to have these qualities represented among AMHS's employees provides it with a "substantial reason" for employing cost-of-living differentials.
However, I reject the State's claim that Alaska residents are also more desirable employees for AMHS because their sensitivity to the needs of the communities served by AMHS makes them less likely to engage in strikes and work stoppages. I question whether local residents are any less likely to strike than any other group, see id. at 1279-80, and also question whether the State's desire to hire employees who may be unwilling to strike is a permissible basis for it to discriminate in the wage levels it pays its employees.